IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| RONALD M. YONEMOTO, | ) | CIVIL NO. 11-00533 JMS-RLP |
| | ) | |
| Plaintiff, | ) | FINDINGS OF FACT AND |
| | ) | CONCLUSIONS OF LAW |
| vs. | ) | |
| | ) | |
| ROBERT A. McDONALD, Secretary, | ) | |
| United States DEPARTMENT OF | ) | |
| VETERANS AFFAIRS, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

## I. INTRODUCTION

The court conducted a non-jury trial in this case on May 5-8, 11-14,

and 27-29, 2015. Pursuant to Federal Rule of Civil Procedure 52(a), the following

constitute the court's Findings of Fact ("Findings") and Conclusions of Law

("Conclusions"). To the extent any Findings as stated may also be deemed to be

Conclusions, they shall also be considered Conclusions. Similarly, to the extent

any Conclusions as stated may be deemed to be Findings, they shall also be

considered Findings. *See In re Bubble Up Del., Inc.*, 684 F.2d 1259, 1262 (9th

Cir. 1982).

## II. **OVERVIEW**

In this workplace discrimination action against Defendant Robert A. McDonald,[1] Secretary, United States Department of Veterans Affairs ("Defendant"), Plaintiff Ronald M. Yonemoto ("Plaintiff") asserts that he was retaliated against for engaging in protected activity in violation of Title VII of the Civil Rights Act of 1964 and the Rehabilitation Act, and discriminated against on the basis of disability in violation of the Rehabilitation Act. In particular, Plaintiff alleges that over the course of several years, the Veterans Administration ("VA"), through Plaintiff's supervisor Dr. Michael Carethers ("Carethers"), retaliated and discriminated against Plaintiff by, among other things, taking away his work, transferring him out of his private office into a semi-public cubicle, and refusing to engage in the interactive process in response to Plaintiff's requests for accommodations for diabetes and depression.

As described in more detail below, throughout this case, Plaintiff has repeatedly attempted to expand his claims beyond what was alleged in his pleadings and what was part of the EEOC investigations. It was only through extensive motions practice -- both on summary judgment and again on the eve of

_____

[1] McDonald replaced Eric Shinseki as the Secretary, Department of Veterans Affairs on July 29, 2014.

trial -- that the scope of Plaintiff's claims became defined.  Specifically, Plaintiff's claims at trial include: (1) a Title VII retaliation claim based on his placement into a semi-public cubicle on April 29, 2010, and a denial of authorized absence (leave with pay) on June 16, 2010; (2) a Title VII retaliatory hostile work environment claim based on a refusal to assign Plaintiff meaningful work and continued placement in a cubicle, actionable beginning April 26, 2010; (3) a Rehabilitation Act denial of reasonable accommodation claim based on discrete acts occurring on or after July 3, 2011; and (4) a hostile work environment Rehabilitation Act claim, occurring from November 30, 2010 to the present.

The evidence presented at trial was expansive, and included live testimony from 15 witnesses, testimony by deposition designation of 3 witnesses, testimony by declaration of 4 witnesses, and admission of 135 exhibits.  The parties presented extensive, detailed evidence spanning fifteen years of Plaintiff's work history with the VA, and 6 years of medical diagnoses and treatment.  A significant amount of the evidence presented involved complaints supervisors received from others regarding Plaintiff's conduct, and this evidence was generally admitted for a limited purpose, such as showing state of mind and/or placing matters in context.  Below, the court does not specify each time certain evidence was admitted for a limited purpose, but uses such evidence only as

permissibly admitted.

The court has heard and weighed all the evidence and testimony presented at trial, observed the demeanor of witnesses and evaluated their credibility and candor, and heard and considered Plaintiff's and Defendant's arguments. Below, the court does not detail the minutia of all of the evidence presented, as many of the details are cumulative, only marginally relevant, and/or unnecessary to understanding the court's ultimate analysis. Rather, the court makes findings sufficient for the parties and the Ninth Circuit to understand the basis of the court's ruling on Plaintiff's claims. *See Norris v. City & Cnty. of San Francisco*, 900 F.2d 1326, 1329 (9th Cir. 1990).

In summary, the evidence reveals that Plaintiff had significant personality and interpersonal problems that prevented him from effectively carrying out his work during the relevant time period. These issues included:

- Whether the assignment was complex or menial, Plaintiff was by and large unable to perform the work assigned without significant input from others and/or without asking numerous questions, which caused more work for others.

- Supervisors fielded numerous complaints from both employees within the VA and individuals outside the VA that Plaintiff was aggressive, confrontational, and/or otherwise inappropriate.

- When counseled regarding his work, Plaintiff refused to take constructive criticism and instead became hostile and defensive, often attacking his supervisor's leadership and/or deflecting the criticisms

4

on others.

- Plaintiff was unaware that his actions were inappropriate and affected how people interacted with him, an issue apparent even during trial.

As explained below, by and large it is these interpersonal problems, and not any unlawful retaliation and/or discrimination, that is the cause of the events that are the basis of Plaintiff's claims. Specifically, the court finds that Plaintiff has failed to prove by a preponderance of the credible evidence that Defendant retaliated against Plaintiff in violation of Title VII or the Rehabilitation Act, except as to Plaintiff's Title VII retaliation claim based on the June 16, 2010 denial of authorized absence. The court further finds that Plaintiff has not prevailed on his Rehabilitation Act claim that he was denied Plaintiff's requests for accommodation.

## III.  PROCEDURAL HISTORY

Plaintiff filed this action on August 31, 2011, and his October 10, 2012 First Amended Complaint ("FAC") asserted claims for: (1) race and national origin discrimination in violation of Title VII (Count I); (2) retaliation in violation of Title VII (Count II); (3) disability discrimination in violation of the Rehabilitation Act (Count III); and (4) retaliation in violation of the Rehabilitation Act (Count IV).

On November 22, 2013, Defendant filed a Motion to Dismiss or for

Summary Judgment. Doc. No. 50. On March 10, 2014, the court granted in part and denied in part the Motion. As the March 10, 2014 Order outlined in detail, Plaintiff had repeatedly attempted to expand his claims with the EEOC Complaints, the FAC, and Plaintiff's arguments before the court containing ever-expanding allegations forming the basis of Plaintiff's claims. *See* Doc. No. 79; *Yonemoto v. Shinseki*, 3 F. Supp. 3d 827, 840-41 (D. Haw. 2014). The March 10 Order was therefore supposed to serve as a clear outline of what claims remained in this action.

In particular, the March 10, 2014 Order held that (1) to be timely, the discrete acts that are the basis of Plaintiff's retaliation and disability claims must have occurred no more than forty-five days prior to Plaintiff's first contact with an EEO counselor regarding those acts; and (2) Plaintiff's hostile work environment claims are timely so long as one act that is the basis of such claim occurred within 45 days of Plaintiff's first contact with an EEO counselor. Here, the parties do not dispute that Plaintiff's first contact with an EEO counselor regarding his Title VII retaliation claims was June 10, 2010, and his first contact regarding his Rehabilitation claims was August 17, 2011. *See* Doc. No. 131, Stipulated Facts ("SF") ¶¶ 21, 72. Applying these principles and after addressing the parties' other summary judgment arguments, the March 10, 2014 Order outlined that Plaintiff's

remaining claims included: (1) a Title VII retaliation claim based on the June 16,

2010 denial of Authorized Absence; (2) a Title VII retaliatory hostile work

environment claim; and (3) Rehabilitation Act claims, to the extent based on

denials of accommodations after July 2, 2011 (*i.e.*, within 45 days of his first

contact with the EEO regarding this claim).  3 F. Supp. 3d at 851.  The parties

subsequently agreed that Plaintiff's Title VII retaliation claim based on discrete

acts included Plaintiff's move from his office space.  Doc. No. 110.

Although the March 10, 2014 Order should have been the final word

on the scope Plaintiff's claims, on the eve of trial, Plaintiff filed a Motion to

Vacate the March 10, 2014 Order, seeking to (1) limit his Title VII retaliatory

hostile work environment claim to events starting April 29, 2010 as opposed to

August 2008 as he alleged in his pleadings; and (2) broaden his denial of

accommodation Rehabilitation Act claim based on an argument he never properly

or previously raised.  The court rejected the Motion to Vacate (as well as a

subsequent Motion for Reconsideration), yet allowed Plaintiff to limit his Title VII

hostile work environment claim to events starting April 29, 2010.  Doc. Nos. 139,

141.  Thus, in its April 22, 2015 Order denying the Motion to Vacate, the court

clarified that Plaintiff's claims remaining in this action include (1) a Title VII

retaliation claim based on discrete acts of the June 16, 2010 denial of Authorized

Absence, and Plaintiff's move from his office space; (2) a Title VII retaliatory hostile work environment claim beginning on April 29, 2010; (3) a Rehabilitation Act discrimination claim based on denial of reasonable accommodations after July 2, 2011; and (4) a Rehabilitation Act retaliatory hostile work environment claim.[2]

On April 14, 2015, the parties submitted their agreed-to Stipulated Facts. Doc. No. 131.

On May 5, 2015, a bench trial proceeded on Plaintiff's remaining claims and spanned 11 days.[3] Closing arguments were heard on June 4, 2015. The parties submitted post-trial briefs on June 18, 2015, Doc. Nos. 188, 189, and rebuttal briefs addressing legal issues raised by the other party on June 25 and 30, 2015. Doc. Nos. 191, 195.

On July 6, 2015, the court notified the parties of its determination that

---

[2] In its post-trial briefing, Plaintiff once again attempts to expand his denial of reasonable accommodation claim, asking the court "to consider adopting February 24, 2011, as the limitations date, as there is no dispute as to [the] need for or the accommodations requested or that the VA knew of the request." Doc. No. 195, Pl.'s Rebuttal Br. at 14. Plaintiff further argues that Defendant should be equitably estopped for any perceived delay in contacting the EEOC regarding his disability claim. *Id.* The court rejects these arguments for all the same reasons explained in its previous orders -- Plaintiff never properly raised these arguments on summary judgment or any other time before trial. It should also go without saying that Plaintiff raising them now in a post-trial *rebuttal* brief is likewise wholly improper.

[3] At the close of Plaintiff's evidence, Defendant made an oral motion pursuant to Federal Rule of Civil Procedure 52(c) for Judgment on Partial Findings. The court declined to render any judgment until the close of evidence, *see* Fed. R. Civ. P. 52(c), and instead issues this Findings of Fact and Conclusions of Law.

Plaintiff has not prevailed on any of his claims except the June 16, 2010 denial of authorized absence, and directed the parties to submit supplemental briefing addressing damages on this limited claim. *See* Doc. No. 196. On July 10, 2015, the parties filed a Stipulation Regarding Damages providing that as a result of the court's finding of liability as to the June 16, 2010 denial of authorized absence, Plaintiff is entitled to equitable relief in the form of back pay pursuant to 42 U.S.C. § 2000e-5(g)(1) in the amount of $117.40, and compensatory damages pursuant to 42 U.S.C. § 1981a(b)(3) in the amount of $1,750. Doc. No. 197.

## IV. <u>FINDINGS OF FACT</u>[4]

### A. Overview

1. Plaintiff's career with the federal government spans over forty years. Plaintiff (1) served in the United States Navy, reaching the rank of Captain 06, (2) obtained his law degree and worked for the Board of Veterans Appeals in Washington D.C., performing claims and benefits review from 1979-2000, (3) worked at the VA Pacific Islands Health Care System ("VAPIHCS")[5] in Honolulu as Special Assistant to the Director (as well as other positions) from

---

[4] The court cites below to the exhibits admitted at trial, the parties' Stipulated Facts, and at times to the trial transcript. Where a fact contains no citation, it is based on the trial testimony.

[5] As described below, VAPIHCS was previously known as the Veterans Affairs Medical Regional Office Center ("VAMROC").

2000-2006, and (4) transferred in 2006 to the Geriatrics Rehabilitation and Extended Care ("GREC") as a Health Systems Specialist, a position he still holds today.

2.     Plaintiff's claims are limited to events that occurred during his employment at the GREC from April 2010 to the present, and are based on Carethers' allegedly discriminatory and/or retaliatory actions, including his (1) failure to assign Plaintiff work, (2) transfer of Plaintiff from a private office to a semi-public cubicle, (3) denial of Authorized Absence on June 16, 1010, and (4) alleged refusal to meaningfully address Plaintiff's requests for accommodations for his diabetes and stress (including requests for more work and a different work space).  To put these claims and Defendant's defenses into context, however, the relevant facts date back much earlier -- Carethers stopped assigning Plaintiff work in 2008, and both parties presented evidence of Plaintiff's work from 2000 through 2010 as evidence of whether Plaintiff was capable of doing the work expected of a GS-13 level employee.

3.     Throughout this litigation and trial, the parties referred to the work that Plaintiff sought and the work that he was capable of doing alternatively as GS-13 level work, work commensurate with Plaintiff's grade level, and/or meaningful work.  The court uses these terms interchangeably, as they are directed

to the same basic concept and no party presented evidence distinguishing between grade levels (*i.e.*, the difference in work between a GS-11, GS-12, or GS-13 employee).

4.      The credible evidence establishes that although Plaintiff was capable and effective at his GS-13 position from 2000-2004, at some time in 2005, Plaintiff's superiors began entrusting Plaintiff with less and less work due to their perception that Plaintiff was aggressive and did not get along with others, did not take criticism maturely, shifted the blame, and made more work than if someone else performed the work. Whether Plaintiff's problems were in part the result of interpersonal politics at VAPIHCS or solely Plaintiff's making (an issue the court ultimately need not decide), the credible evidence at trial amply establishes that Plaintiff was, in short, a difficult employee to manage and that his interpersonal issues prevented him from performing the work of a GS-13 employee.

5.      In 2006, Plaintiff agreed to take a position with the GREC under the supervision of Carethers. Numerous sources of evidence describe Plaintiff's tenure at the GREC, with Plaintiff and Carethers as the primary testifying witnesses about these events. Not surprisingly, Carethers' and Plaintiff's testimony differed on certain key issues (detailed below).

6.      The credible evidence presented establishes that although Plaintiff

had a clean slate to establish a working relationship with his new supervisor, like Plaintiff's previous supervisors, Carethers had similar significant difficulties with Plaintiff -- employees and others complained that Plaintiff was intimidating and/or otherwise inappropriate, Plaintiff often openly challenged Carethers and his assignments, and Carethers found over time that giving Plaintiff assignments only caused more work than if he did them himself.  And Plaintiff's interpersonal problems were only exacerbated by Plaintiff's inability to take criticism constructively and refusal to acknowledge his contribution to these issues, the latter of which the court saw first-hand in Plaintiff's testimony.  It further appears that Plaintiff's demeanor alienated Carethers, who himself was prone to his own contrivances and/or did not have the time to properly deal with such a difficult employee.  As a result, Carethers' solution was simply to assign Plaintiff virtually no work.

7.     The stress caused by the lack of work and his move to a semi-public work area contributed to Plaintiff's depression and inability to control his diabetes, which resulted in Plaintiff taking a leave of absence from November 2010 through April 2012.  When Plaintiff requested accommodations for his diabetes to return to work, Carethers again largely ignored Plaintiff.  Plaintiff nonetheless returned to work, where it is only recently that Plaintiff started receiving more meaningful

assignments. The court provides more details to these facts as follows.

**B.    Plaintiff's Work From 2000 to 2004 Under Director Dr. H. David Burge**

8.    In the spring of 2000, Plaintiff transferred from the Board of

Veterans Appeals in Washington D.C. to VAMROC in Honolulu, to serve as the

Special Assistant to the Director, H. David Burge.  At this time, Burge was in the

midst of attempting to clean up the "mess" that was VAMROC -- it was ranked

last in terms of medical performance and on the brink of being shut down, and

veterans were angry with delays in service and openly hostile to the VA and its

leadership in Hawaii.  Burge and Plaintiff were friends since the 1980s, and Burge

believed that Plaintiff's military and VA background would be an asset in turning

around VAMROC.  Burge and Plaintiff continued their friendship in Hawaii,

carpooling to work and exercising in the evenings together.

9.    According to Burge, who the court finds credible, Plaintiff

contributed to getting VAMROC back on track -- he increased VA enrollment

(thereby allowing more services and facilities for veteran care), set up the

financial/referral system to ensure the VA did not get double-billed for services

provided by Tripler Army Medical Center, and worked as a public affairs officer

in repairing the relationship between the VA and veterans.  These assignments

were GS-13 level work, and Plaintiff greatly contributed to the national VA

ranking the Hawaii facility as a top facility in the nation. According to Burge, Plaintiff's work was outstanding.

10. To get results, Plaintiff pushed other employees, and Burge received some complaints regarding Plaintiff. Burge expected all of his leadership team to push for results, however, and these complaints were not unusual -- he received complaints on all of his leadership team. Given the important work needing to be done, Burge expected employees to set aside interpersonal rifts for the greater good (including a rift between Plaintiff and Dr. Steven MacBride, another individual within Burge's leadership circle who was Chief of Staff at this time).

11. In 2003, Burge put Plaintiff in charge of a major project involving splitting the medical portion of the VA from the benefits administration side, which involved millions of dollars and physically reconfiguring the VA Tripler campus. This project took all of Plaintiff's time, and in May 2004, Burge reassigned what remained of the project to Mary Cronin, who was head of the Information Resources Management Service. Although Burge testified that he took Plaintiff off this project so that he could focus on his public affairs function, Plaintiff did not receive another assignment and he did not have much work to do. Plaintiff was upset in having this project taken away from him and he filed an EEO Complaint, accusing Cronin and Burge of conspiring together to prevent his

advancement.

12.     The court does not draw an inference that Plaintiff could not perform GS-13 work in 2004 based the fact that Burge took away this assignment from Plaintiff.  Burge credibly testified that he would have no hesitation in rehiring Plaintiff to perform the same type of work.  Doc. No. 182, Trial Tr. 10-93.  The court therefore finds that Plaintiff was successfully performing GS-13 level work during Burge's tenure.

**C.     Plaintiff's Work from 2004 to 2005 Under Acting Director Dr. Brian O'Neill**

13.     In September 2004, Dr. Brian O'Neill became the Acting Director of VAPIHCS, a position he held until October 2005.  At this time, the VAPIHCS still had significant issues with finances, access to care, and the need for expansion of the health care system.  O'Neill, who the court finds extremely credible, also described that there was a schism within his leadership team, divided amongst those employees who got along with Plaintiff (including Associate Chief of Staff - Primary Care, Dr. Daniel Bouland), and those that did not (including MacBride and many other members of the leadership team), which created significant problems in developing and maintaining a harmonious work environment.  Like Burge, however, O'Neill expected people to set aside their personal differences

and focus on their job at hand to improve veteran care in Hawaii.

14. O'Neill expected that Plaintiff would be able to perform all the duties within the job description of Special Assistant to the Director, which gave Plaintiff responsibility for, among other things, special projects, staff work, and managing community and stakeholder relations. *See* Def.'s Ex. 501. O'Neill described that in this position, Plaintiff was expected to achieve projects, write effectively as required, provide leadership in achieving outcomes, and be able to work effectively with the staff to achieve goals of the organization. Doc. No. 172, Trial Tr. 4-11. In addition to his regular duties, Plaintiff also agreed to fill the position of compliance officer, which required specialized training and which was an open position for which O'Neill lacked funding. In all these duties, O'Neill expected Plaintiff to function independently and autonomously with limited oversight.

15. According to O'Neill, interpersonal effectiveness was a critical skill for Plaintiff to carry out his duties, yet Plaintiff was perceived as heavy-handed, using control and antagonization in dealing with other employees. Put simply, Plaintiff needed to work well with others to be effective in his job, and O'Neill found that Plaintiff lacked this ability and instead was a polarizing individual who did not create an environment of mutual trust and understanding. In fact, O'Neill testified that over the course of his 25-year career as an executive, he has "never

seen the situation where one individual so polarized an organization," and although "there were a lot of people to blame," the focus of many people was on Plaintiff.  *See* Doc. No. 172, Trial Tr. at 4-145.  As a result, several employees complained to O'Neill regarding Plaintiff's perceived intimidating conduct.  *See, e.g.*, *id.* at 4-41; Def.'s Ex. 503.

16.     O'Neill has mentored many individuals throughout his career as an executive with the VA, and O'Neill tried to do the same for Plaintiff, meeting with Plaintiff "many times a week" in the first months of O'Neill's tenure.  Doc. No. 172, Trial Tr. at 4-58.  At this time, O'Neill was still assessing Plaintiff's overall capabilities, and he attempted to coach Plaintiff to improve his interpersonal effectiveness and communication, *i.e.*, how he interacted with others and how to be constructive.  *Id.* at 4-12 - 4-13.

17.     In February 2005, O'Neill provided Plaintiff his six-month review. Each employee receives a performance plan for the following year, and the supervisor is responsible for providing a progress review after six months, and a year-end evaluation.  These reviews require a supervisor to rate an employee in several critical elements and also provide five possible overall ratings -- outstanding, excellent, fully successful, minimally satisfactory, and unacceptable. In practice, the vast majority of employees receive outstanding or excellent

ratings, with less than twenty percent receiving a fully successful rating, and less than five percent receiving a lower rating. Indeed, O'Neill testified that he fills out hundreds of these forms, and generally ranks 90% of his employees either outstanding or excellent.

18.  For Plaintiff's six-month review, O'Neill had observed Plaintiff for only four months, and rated him as "excellent." Def.'s Ex. 501. Although the review was generally positive, O'Neill wrote in his narrative that "cliques" existed within VAPIHCS and urged Plaintiff to work on communication skills and interpersonal effectiveness with *all* staff (not only those with whom he gets along) because "[i]nterpersonal effectiveness is the HPDM core competency that holds the key to Mr. Yonemoto's long term effectiveness within his current role at the PIHCS." *Id.* at YAD009661. Plaintiff also submitted a self-assessment, which raised some concerns for O'Neill as it suggested that Plaintiff did not understand how he was perceived by others (for example, Plaintiff asserted that he is "a person whom the staff trust to have their problems resolved"). O'Neill credibly testified that when he made suggestions to Plaintiff during his in-person review, Plaintiff challenged O'Neill's comments, became accusatory of others' conduct, and was generally not receptive to the criticism.

19.  As part of this review, O'Neill asked Plaintiff to conduct a "360

degree" assessment in which Plaintiff would obtain evaluations from coworkers on an anonymous basis. Doc. No. 176, Trial Tr. at 7-142 - 7-143. Plaintiff started the process, put together a list of coworkers to provide evaluations, but then threw away the results without looking at them when he learned that O'Neill had changed the list of coworkers to include individuals with whom Plaintiff did not get along. *Id.* at 7-143; Doc. No. 180, Trial Tr. 8-85. Plaintiff testified that he "thought the process was compromised, unfair and geared to target me and make me feel bad." Doc. No. 180, Trial Tr. 8-86. Regardless of whether Plaintiff disagreed with the process, Plaintiff's reaction was inappropriate and is further evidence of Plaintiff's refusal to take criticism.

20.     After this review, O'Neill found it increasingly difficult to work with Plaintiff, with O'Neill fielding complaints about Plaintiff's trustworthiness, reliability, and perceived intimidation of other employees. Doc. No. 172, Trial Tr. 4-23; *see also* Def.'s Ex. 503 (September 23, 2005 email, admitted without any limitation, from employee to O'Neill reporting intimidation by Plaintiff).[6]

21.     O'Neill also found that Plaintiff could be petty and/or juvenile, and often made, as O'Neill aptly described, a "mountain out of a mole hill." Doc. No.

---

[6] Defendant also submitted by declaration the trial testimony of Dewey Brown, Ronald B. Savoy, Gary VanBrocklyn, and David Bernstein, which recite a number of specific instances in which Plaintiff was difficult to work with, was aggressive and/or otherwise acted inappropriately. *See generally* Doc. No. 178-1.

172, Trial Tr. 4-42 - 4-43.  For example, O'Neill informally counseled Plaintiff after receiving complaints that Plaintiff was often absent from his office and was instead wandering around the facility chatting with other employees.  In response, Plaintiff started sending O'Neill several emails each day reporting his activities (*e.g.*, going to the bathroom, lunch, etc.).  *Id.* at 4-41 - 4-42.  As another example, O'Neill informally counseled Plaintiff after receiving a written complaint from Cronin that she found offensive Plaintiff's reference to another employee as a "Chinese girl."[7]  Plaintiff's reaction was well out of proportion with this informal counseling -- Plaintiff became defensive, requested that Human Resources conduct training for all employees, suggested that O'Neill follow up with the principal deputy undersecretary who used the term "boys and girls" during a meeting, and even hired a linguist to write a report.  *See id.* at 4-32 - 4-38; Def.'s Ex. 502, Doc. No. 180, Trial Tr. 8-30.

    22.     Certainly, some part of Plaintiff's inability to work effectively with others may be attributed to the warring cliques at VAPIHCS -- Plaintiff no longer had Burge in the Director's position as a close ally and friend, and there is no dispute that others in the leadership team (MacBride in particular) neither liked

---

[7] The court recognizes that in Hawaii, it is not uncommon to describe someone by ethnicity, and context matters as to whether such language is intended as derogatory or not.

nor respected Plaintiff.  *See, e.g.*, Pl.'s Exs. 3-8, 10 (emails between MacBride, Cronin, and others referring to Plaintiff derisively).  Plaintiff, however, did nothing to bridge these relationships to work effectively with these individuals.

23.    By the end of O'Neill's tenure, O'Neill had begun limiting Plaintiff's work because O'Neill found him not effective in obtaining results.  *See* Doc. No. 172, Trial Tr. 4-44 - 4-45.  Plaintiff's primary assignment at this time was to serve in a part-time capacity as compliance officer (ensuring that the facility complies with regulations).  O'Neill wrote in his final review, dated October 2005, that Plaintiff (1) made only a limited contribution to "writing 'white papers'; assisting in strategic planning program; responding to complex suspenses; helping with complex problem solving, etc.;" (2) lacked "very good insight into his own performance, which . . . serves as a serious impediment to personal growth and development;" (3) was not open to suggestion and instead defensive to suggestions and feedback; and (4) has "extremely variable" interpersonal effectiveness, which constrained the activities O'Neill could assign him and was a "significant shortcoming" for Plaintiff's position as Special Assistant to the Director.  Overall, O'Neill ranked Plaintiff "fully successful," a rating he provides to the bottom 10-15% of his employees.  Def.'s Ex. 504.

24.    In comparison to O'Neill's negative review of Plaintiff's work,

Bouland testified that in the spring of 2004, he became the Director of the Office of Referral and Management Services, and that at some time during his tenure, Plaintiff provided him excellent assistance in creating a bill tracking process and advising on regulatory requirements for a dialysis unit. Bouland further testified that MacBride was a toxic element in the leadership of VAPIHCS, and "poisoned" Plaintiff's relationship with O'Neill. To the extent Bouland's testimony contradicts O'Neill, the court credits O'Neill's testimony -- O'Neill appeared very credible to the court, was responsible for overseeing Plaintiff's work, and was an outsider to the significant politics infecting VAPIHCS (as opposed to Bouland who had worked with these individuals since 2000 and had significant problems with MacBride, including obtaining a temporary restraining order against him, which Plaintiff assisted in serving and for which Plaintiff was reprimanded after he improperly obtained MacBride's home address).

25.     When O'Neill gave Plaintiff his 2005 annual review in person, Plaintiff had a strong, angry reaction, challenged O'Neill, and demanded to know who had complained about him. According to Plaintiff, this review was "a form of character assassination," and was "extremely devastating" to his career. *See* Doc. No. 176, Trial Tr. 7-144, 7-146 -7-147. When O'Neill refused to provide names of individuals who complained, Plaintiff abruptly left the meeting. O'Neill left

VAPIHCS shortly after this meeting, and although O'Neill offered to speak with Plaintiff again about his review, Plaintiff demanded that such a meeting be transcribed. Given Plaintiff's significant litigation history by this time (including several EEO charges), O'Neill declined, concerned that Plaintiff would use the recording against him in some fashion.

26. Based on this evidence, and in particular O'Neill's extremely credible testimony, the court draws the conclusion that at some point in 2005, Plaintiff could no longer perform GS-13 level work because his interpersonal problems significantly interfered with his ability to work with others, an essential skill of his position.

**D. Plaintiff's Work from November 2005 to August 2006 Under Director Dr. James E. Hastings**

27. In November 2005, Dr. James E. Hastings became Director of VAPIHCS. Although Hastings was initially pleased to learn that he had a Special Assistant, he received complaints arising from Plaintiff's conduct in carrying out his duties. These complaints included that Plaintiff was no longer welcome at Tripler, a very important partner with the VA. Hastings also fielded another complaint from a well-regarded supervisor, Mary Zadlow, that she was very upset with an interaction she had with Plaintiff and that "if she ever had to work with him again, she'd resign." Doc. No. 149-1, Hastings Depo. at 39. As a result of

these complaints, Hastings made the decision that he could not afford to have his senior administrative officer, who spoke for him, be perceived by others both within and outside VAPIHCS in a negative way. *Id.* at 44. Hastings therefore eliminated Plaintiff's position.

28. In eliminating the position, Hastings met with Plaintiff to discuss where Plaintiff believed he could contribute within the organization. They identified the GREC as the best fit, because providing care for aging veterans was an area of growth and Plaintiff's experience as an administrator could be put to good use. Hastings did not believe that this was a "pejorative move at all," but one that was "good for the organization." *Id.* at 50.

29. Hastings in turn spoke with Carethers, the Associate Chief of Staff ("ACOS"), GREC, and explained that although Plaintiff had some difficulties with other employees, Hastings believed Plaintiff could help on the administrative end for several new projects at the GREC. *See* Doc. No. 181, Trial Tr. at 9-16.

**E. Plaintiff's Work at the GREC**

30. On August 20, 2006, Plaintiff became a Health Systems Specialist GS-13 at the Center for Aging, aka Community Living Center/Center For Aging ("CFA") within the GREC, under the direct supervision of Carethers. Plaintiff still holds his Health Systems Specialist position today. Doc. No. 131, SF ¶ 1.

31.     Carethers has been the ACOS for the GREC since 2001, and has worked an average of 60 hours per week for the last ten years.  As of 2006, the GREC had between 60-80 employees, and has since grown to have 167 employees.  The GREC now offers fifteen different programs, and has a budget of approximately $17 million.

32.     The position description for Plaintiff's Health Systems Specialist position provides that "[t]he incumbent reports directly to the ACOS for [the GREC] and assists in developing and implementing new GREC Programs . . . ." Pl.'s Ex. 136.  The duties of this position are managerial in nature and primarily program development and implementation.  *See id.*

### 1.     *Plaintiff's Work from August 2006 Through August 2008*

33.     Carethers assigned Plaintiff to two main projects from August 2006 through August 2008.  One project to which Carethers assigned Plaintiff was the Medical Foster Home Program, where the VA provided care to patients who are at the nursing home level of care in a care home.  Plaintiff's assignment was to help the director of this program, Charlotte Kuwanoe, with the administrative aspects of getting the project off the ground.  Carethers took Plaintiff off this project several months later, however, after Kuwanoe reported to Carethers that it would be easier for her to do the work herself than to have to explain all of the clinical

aspects to Plaintiff.  Doc. No. 181, Trial Tr. at 9-65 - 9-66.

34.     The second and more substantive project to which Plaintiff was assigned was the State Veterans Home ("SVH") project, in which the federal government and the State of Hawaii worked together to bring a State-run veterans' home to Hilo, Hawaii.  The project, to be completed in two years, called for the federal government to pay most of the construction costs for the home, with the State to manage and operate the facility according to VA requirements for standards of care.  Carethers had never led a project of this scale, and he looked to Plaintiff to be the point person for the administrative duties of this project, including coordinating meetings, preparing policies and procedures, and communicating with the various parties.  Although Plaintiff did not have clinical experience, these tasks did not require clinical expertise and the clinical portion of the project (inspections) would not occur until later in 2008.  *Id.* at 9-19.

35.     Carethers credibly testified that there were several issues with Plaintiff's work on this project.  For example, although Plaintiff was effective in scheduling meetings for this project, Plaintiff lacked the acumen to synthesize data from the regulations.  Carethers further found that when assigned a task, Plaintiff would ask numerous questions -- often sending a "barrage" of emails -- which showed a lack of initiative in finding out the answers on his own that Carethers

expected of GS-13 employees. Doc. No. 181, Trial Tr. 9-59 - 9-60. The result of Plaintiff's performance was that Carethers did a lot of the work himself or assigned it to others. *Id.* at 9-168.

36.     Kaulatie JangDhari, the Associate Director of VAPIHCS at this time, represented leadership in connection with the SVH Project and understood that Plaintiff was a primary liaison for the VA on this project. Doc. No. 183, Trial Tr. 11-9. She credibly testified that Plaintiff's performance fell short of her expectations for scheduling meetings and communicating information regarding the budget, staffing, and pharmacy collaboration. *Id.* at 11-13. As a result, Carethers spent a lot of time gathering the information she required. *Id.* at 11-20.

37.     Beyond the substance of Plaintiff's work, Plaintiff's demeanor also caused problems, with Plaintiff alienating people that were necessary for the project, and Plaintiff even took an aggressive, challenging demeanor with Carethers on occasion.

38.     For example, in November 2006, Plaintiff came to Carethers' office and told him that he had several EEO claims against the Director and Miles Miyamoto, the Assistant Regional Counsel for the VA, and that he was not afraid to come after Carethers. Doc. No. 181, Trial Tr. at 9-20 - 9-25. Plaintiff made these statements while he was standing up, positioned close to Carethers' desk, in

a loud voice, and with his finger pointed. *Id.* When Carethers asked if Plaintiff thought Carethers was "messing with him," Plaintiff responded "no," but wanted Carethers to be aware of his EEO activities. *Id.* at 9-25. Indeed, beyond Plaintiff's EEO Complaint stemming from Burge taking away the VAMROC transition project from him, Plaintiff initiated four other EEO charges against VAPIHCS from July 28, 2005 through November 2, 2006. *See* Doc. No. 131, SF ¶ 5. To be sure, there is no problem with Plaintiff engaging in EEO activity and/or notifying his supervisor of these activities. Rather, the problem is the manner in how Plaintiff told Carethers, which appeared as a challenge and/or threat, and is another instance of Plaintiff not thinking about how his tone and manner affect how people perceive and react to him.

39.     As another example, in November 2006, Carethers and Plaintiff had an email exchange in which Carethers cautioned Plaintiff. The issue arose after Carethers, in an email addressed to JangDhari and Plaintiff, thanked JangDhari for providing information relevant to the SVH project. In response, Plaintiff wrote to Carethers separately, "[e]ither you do the work and I will wait for your instruction or delegate it to me and I will take the initiative. Please clarify on how you want to operate . . . Please let go. Doesn't make you look good." Def.'s Ex. 511. Carethers found Plaintiff's email surprising, as Plaintiff's role was to assist

Carethers and they needed to work together. Carethers cautioned Plaintiff about the tone of his email and stressed that they are "we all are working together," and "are only here to service veterans." *Id.* At trial, Plaintiff conceded that his email was inappropriate. Doc. No. 176, Trial Tr. 7-156 - 7-157.

40. Carethers also found that Plaintiff acted inappropriately at meetings. In particular, both Plaintiff and Carethers attended meetings of the SVH Activation Committee in 2006 and 2007, and Carethers credibly testified that in some of these meetings Plaintiff would dominate discussions, acting very aggressively and taking over Carethers' role as chair instead of being a participant. Doc. No. 181, Trial Tr. at 9-37 - 9-38. Carethers recalled that at one specific meeting, Plaintiff took over for 45 minutes by delegating assignments inappropriately, including to Carethers himself. *Id.* at 9-38 - 9-39. Carethers observed that others reacted with surprise and disgust, and several participants later told Carethers that they dreaded coming to meetings with Plaintiff. *Id.* at 9-39 - 9-40. Plaintiff's conduct caused Carethers to cut Plaintiff off in later meetings. *Id*. at 9-40 - 9-41.

41. Wayne Valey, a VA Program Analyst assigned to the Business Policy Office of Veterans Health Administration's Chief Business Office in Denver, consulted on the SVH project and attended meetings with Plaintiff during his first

visit in May 2007.  Doc. No. 125-9, Valey Decl. ¶¶ 6, 10.  Although his interactions with Plaintiff spanned only a few days, he had such a negative reaction to Plaintiff that he raised his concerns with Carethers.  Specifically, Valey found that Plaintiff lacked experience and appeared to detach himself from process, expressing that it was the State's, not the VA's, responsibility to make progress on the Project.  *Id.* ¶ 10.  Valey also observed that Plaintiff appeared frustrated and/or agitated at meetings -- *e.g.*, grimacing, raising his eyebrows -- to the point where Valey spoke to Carethers about his observations and forwarded to Carethers a brief email outlining the signs to watch for in individuals that may indicate the potential for workplace violence.  *Id.* ¶¶ 11, 13; Def.'s Ex. 523.  Although Carethers did not believe that Plaintiff was dangerous, Valey's concerns were additional confirmation to Carethers that Plaintiff had difficulties getting along with others, which was necessary for the SVH project.  Doc. No. 181, Trial Tr. at 9-45.

42.     In comparison to Valey's and Carethers' testimony, Carswell J. Ross Jr., who was the State Veterans' Services Coordinator, attended some meetings on the SVH project and testified that Plaintiff contributed positively to the project and was helpful, engaged, and focused during meetings.  JangDhari also attended some meetings and testified that she did not recall Plaintiff acting inappropriately.  The

court finds that such limited testimony does not discredit Carethers' and Valey's credible testimony that Plaintiff acted aggressively and/or inappropriately during at least some of these meetings.

43.    Plaintiff's difficulties with others were not limited to his substantive work on these two projects. Rather, Carethers fielded several employee complaints and/or issues regarding Plaintiff over this time, including:

•    In June 2007, Carethers learned from the Provost Marshal that Plaintiff had attempted to restrict an active duty soldier from parking at the CFA parking lot. Carethers advised Plaintiff that he was not responsible for policing the parking lot and that according to the Provost Marshal, the CFA parking lot was open for anyone to park there. Although Carethers believed this conversation should have ended the discussion, Plaintiff criticized Carethers' leadership and continued to raise the issue multiple times. *See* Def.'s Ex. 1024; Doc. No. 181, Trial Tr. at 9-35 - 9-37. Carethers found Plaintiff's conduct "very inappropriate." Doc. No. 181, Trial Tr. at 9-37.

•    In April 2008, Carethers received complaints from Administrative Officer Laverne Spillane and Dr. Cara Lum after Plaintiff had moved a credenza from Lum's office without Lum's permission. Carethers was informed that Lum had insisted that she be present for the move to ensure that patient information was kept confidential, yet Plaintiff went ahead and moved it outside her presence. Def.'s Ex. 521. Spillane also provided a written complaint, asserting that Plaintiff used a threatening demeanor with her in seeking to have the furniture moved, raised his voice, and stormed out of her office. Def.'s Ex. 522. After reviewing this incident, Carethers recommended that Plaintiff be suspended for seven days, and the Chief of Staff William Dubbs decided to suspend Plaintiff for two days. Def.'s Ex. 527. At trial, Plaintiff testified that he does not think he did anything wrong, and that he was simply trying to help Lum. Doc. No. 176, Trial Tr. 7-159-160.

•    On April 10, 2008, Carethers received a written
complaint from Jackie Woodruff, Carethers' interim secretary, stating
that Plaintiff took her cell phone from her office.  She reported that
after she called it several times, Plaintiff finally answered and
returned it.  Def.'s Ex. 524.  Plaintiff testified that he was sorry this
incident occurred and acknowledged that it was wrong for him to take
the phone, but asserted that he "didn't realize it was her phone."
Doc. No. 176, Trial Tr. at 7-161.

44.    Carethers credibly testified that he attempted to counsel Plaintiff

regarding his effectiveness on several occasions, and in response, Plaintiff would

deflect the conversation, attack Carethers' leadership, become aggressive, and

argue that he was being treated differently.  Doc. No. 181, Trial Tr. at 9-62 - 9-63.

45.    In June 2008, Carethers took Plaintiff off the SVH project.

Carethers' reasons were two-fold.  One reason was Plaintiff's lack of effectiveness

in his administrative role due to his "personality traits and the constant conflicts

that were occurring" that result in "a lot of work to do damage control."  *Id.* at 9-

20.  The second reason was that the project was entering the survey phrase,

requiring specialized clinical experience that Plaintiff did not have (even Carethers

needed to attend training).  Thus, by August 2008, Plaintiff's only duty on this

project was to set up meetings.  *Id.* at 9-67 - 9-68.

///

///

## 2. Plaintiff's Work from August 2008 to 2010

46.     By August 2008, Plaintiff had very little work to do at the CFA, and Carethers assigned Plaintiff only specific duties requiring minimal relationships with other employees.  It appears that by this time, Carethers simply had had enough of dealing with Plaintiff -- Carethers had given Plaintiff ample opportunity to show his ability to work in a team atmosphere on substantive work, and time and again, Carethers had to deal with Plaintiff's interpersonal problems, defensive attitude, and immature antics.

47.     Carethers credibly testified that he did not believe that Plaintiff could complete GS-13 level work because such work requires an employee to be independent, interact with others, and deal with complex issues.  *Id.* at 9-88. Instead, the work assigned to Plaintiff was well below his grade level and occupied at most only 8 hours of his time per month.

48.     For example, Carethers tasked Plaintiff with researching and proposing a solution to the feral cat problem in the area, and being the combined federal campaign key worker, which required him to seek donations from the CFA staff.  *See* Pl.'s Ex. 342.  Carethers also assigned Plaintiff the ongoing tasks of performing Material Safety Data Sheet ("MSDS") inventory (*i.e.*, taking an inventory of the hazardous materials at the CFA), inspecting fire extinguishers

kept in nurse vehicles, and conducting controlled substance inspections, which required another employee to assist him because he did not have permission to use the computerized personnel reporting system necessary for this task. The MSDS inventory project resulted in Plaintiff sending multiple emails to Carethers seeking clarification, information, and in one instance even complaining that Spillane had cancelled an order for $28.45 worth of index tabs which Plaintiff asserted he needed to complete the task. *See* Def.'s Exs. 535, 536, 538. Needless to say, these are issues that Plaintiff could have figured out on his own and/or asked others for guidance instead of raising it to Carethers. As even Plaintiff admitted, the MSDS project was simple -- requiring him to only count the amounts of hazardous materials, Doc. No. 174, Trial Tr. at 6-12 - 6-13 -- such that the court agrees with Carethers' assessment that Plaintiff's multiple emails to Carethers, who is overseeing the entire GREC, were inappropriate.

49.     Carethers further credibly testified that he did not see any improvement as to Plaintiff's effectiveness over this time -- Plaintiff was hostile during their daily morning meetings and he never volunteered for any particular task (Plaintiff testified that he believes it is not his job to find work, but Carethers' job to assign it, Doc. No. 176, Trial Tr. at 7-189). Although Carethers tried to find Plaintiff work outside of the GREC, such offers were declined (based on others'

views that Plaintiff was a problem employee), despite understaffing throughout the VA.  *See, e.g.*, Doc. No. 178-3, Gary VanBrocklyn Decl. ¶ 3; Doc. No. 178-4, David Bernstein Decl. ¶ 9; *see also* Doc. No. 181, Trial Tr. at 9-77 - 9-79.

50.     Carethers also continued to have problems dealing with Plaintiff's interactions with others.  For example, in May 2010, Spillane emailed Plaintiff, copying Carethers and two others, asking Plaintiff to remove a bottle of insecticide from his office because it presents a safety hazard.  In response, Plaintiff sent multiple emails to Spillane demanding the basis for her assertions and other information.  When she failed to respond, Plaintiff emailed Carethers, asserting that her nonresponsiveness "reflects lack of common courtesy and creates a HOSTILE WORKING CLIMATE," and that Carethers' failure to counsel Spillane "is a reflection on your leadership and management."  Def.'s Ex. 542.

51.     As another example, Carethers and Spillane once saw Plaintiff approximately ten or fifteen minutes walking distance from the CFA during working hours, and Carethers asked why he was so far away from the building.  In response, Plaintiff sent multiple emails, questioning why Carethers was targeting him, and whether Carethers also questioned Spillane about what Plaintiff saw was her violation of the parking policy.  Plaintiff attached a series of emails between himself and Randell Locke, an MP, reporting several instances in which Spillane

parked her vehicle in the loading dock area.  *See* Def.'s Ex. 545.  Plaintiff also confronted Carethers in his office, raising his voice and pointing his finger at Carethers.  Doc. No. 181, Trial Tr. at 9-75 - 9-76.  In an email response, Carethers explained, among other things, that (1) Plaintiff was seen at various times throughout the hallways and other areas talking to other employees and that these times should be factored into his break times; and (2) the parking policy and patrolling is not Plaintiff's responsibility.  Def.'s Ex. 545.

52.     Plaintiff testified that he walked to relieve the stress of having no work to do, and after this altercation, he was afraid leave his desk, although he continued his walks.  Doc. No. 180, Trial Tr. at 8-107.  The court finds that Plaintiff's assertion that he was afraid to leave his desk was unwarranted and a grave overreaction to the situation (as was typical of Plaintiff during much of his career at VAPIHCS).

53.     Carethers' credibly testified that his refusal to assign Plaintiff meaningful work was the least onerous way to deal with such a difficult employee. Carethers had already attempted to correct Plaintiff's conduct by talking to him (which did not work), and the other option was to implement a performance improvement plan ("PIP"), which outlines the areas of needed improvement and a schedule for a manager to provide assistance to the employee.  In practice, PIPs

are rarely used. Allyson Ebalaroza, a human resources employee who administers the VA's performance management system, testified that VAPIHCS did not issue any PIPs in 2010, 2011, or 2012, issued one PIP in 2013, and 4 PIPS in 2014. Doc. No. 170, Trial Tr. at 2-11 - 2-12. Carethers credibly explained that a PIP would have taken a tremendous amount of energy and would have been just another source of conflict in dealing with Plaintiff. Doc. No. 181, Trial Tr. at 9-69. Indeed, given Plaintiff's confrontations and deflections of even informal counseling, Carethers' concerns were well founded. Instead, Carethers reviewed Plaintiff as "fully successful" in each of his reviews with little narrative or comments, *see, e.g.*, Pl.'s Ex. 345 (review period October 1, 2009 to September 30, 2010), Pl.'s Ex. 378 (review period October 1, 2010 to September 30, 2011), and generally ignored Plaintiff's requests for more work.

54. Plaintiff's ratings of "fully successful," when put in context, do not support the inference that Plaintiff was doing a good job and/or was capable of performing the duties of a GS-13 level Health Specialist position. In particular, although performance evaluations are expected to be completely truthful, a "fully successful" rating, despite its name, is not positive. Rather, Carethers explained that he evaluates only 10% of his employees as "fully successful" or lower, and such ratings are usually for new employees. Where a veteran employee such as

Plaintiff receives such a rating, it suggests there are problems with the employee. Doc. No. 181, Trial Tr. at 9-117 - 9-118. And Plaintiff knew such rating was a bad sign, given his previous reaction to O'Neill giving him this rating and calling it "character assassination."

55. The court finds, based on this evidence recited above, that Plaintiff was unable to perform GS-13 level work.

56. The parties dispute whether it was made known to Plaintiff that his challenging personality and propensity to make work for others was the reason Carethers stopped assigning Plaintiff work. In particular, Plaintiff testified that Carethers never spoke to him about his work performance. In comparison, Carethers testified that he tried to counsel Plaintiff on several occasions, but Plaintiff was defensive and/or deflected the criticism. The court finds Carethers' testimony on this point credible and discounts Plaintiff's testimony on this matter as inconsistent with the record presented to the court. Indeed, beyond Carethers' early counseling of Plaintiff, Plaintiff attended a December 4, 2008 deposition of Carethers in which Carethers testified that Plaintiff could not perform the substantive work assigned and that he caused problems with others. *See* Doc. No. 176, Trial Tr. at 7-108-111. Only after being read Carethers' testimony did Plaintiff assert that he had forgotten about this testimony and that he did not "truly

understand what [Carethers] was talking about because he was not specific." *Id.* at 113. Plaintiff's testimony is not credible.

57. Needless to say, Carethers' decision to deal with Plaintiff in this manner was not the best coping technique, and there is some evidence that Carethers treated employees who challenged him poorly. For example, Spillane testified that after she challenged one of Carethers' decisions, their relationship was strained, he was condescending, and he scrutinized her work more. Spillane further testified that when Carethers is dissatisfied with an employee, "he would possibly do things to make working for him unpleasant," Doc. No. 150-1, Spillane Depo. at 109-10, that he has created a culture of fear in the GREC where people are afraid of repercussions, and that he retaliates against employees who challenge him to get them to leave. *Id.* at 177-78. Spillane also recounted several instances of what she considered retaliation by Carethers for her requests for accommodation for a disability and EEO activity.

58. The court gives limited weight to Spillane's testimony that Carethers treated poorly employees who did not perform well and/or challenged him. Spillane had her own problems with Carethers, and in testifying, she appeared hostile to Carethers and somewhat biased in her perception. Spillane brought a federal action against the VA based on Carethers' treatment of her and alleging

retaliation, which was dismissed on summary judgment. *See Spillane v. Shinseki*, 2015 WL 71502 (D. Haw. Jan. 6, 2015). As a result, the court gives *no* weight to her testimony that Carethers retaliated against her in response to her requests for accommodation and EEO activity. With that said, however, Spillane's testimony suggests that Carethers' management style left ample room for improvement.

### 3. *Plaintiff's Requests for Work*

59. Plaintiff credibly testified that his lack of work was "sheer boredom," and that he occupied himself by reading the paper or watching videos, which made him feel guilty. Doc. No. 174, Trial Tr. at 6-24.

60. As a result of his lack of work, Plaintiff often asked Carethers for assignments during Carethers' daily 7:30 a.m. meetings, which Plaintiff was required to attend. In response, Carethers would respond, "[n]othing for today." *Id.* at 6-26.

61. Plaintiff sent multiple emails requesting work, which emphasized that the lack of work was causing him stress. For example, on June 29, 2009, Plaintiff reported to Dr. Carethers by e-mail, "I am concerned of my low work load and almost non-existing assignment from you. To cope with the stress of doing nothing, I have worked on EEO issues. Even though I have reported my EEO activity to you on a weekly basis, you have remained silent. Not having any work

is very stressful for me, and during our morning meetings, I have asked you if you have anything for me.  You have continually responded by stating '[n]othing for today.'"  Doc. No. 131, SF ¶ 3; Pl.'s Ex. 35.  *See also* Pl.'s Exs. 334, 337.

62.    Plaintiff credibly testified that the lack of work caused him stress and depression, made him feel guilty for taking a salary with no work, and humiliated him in front of other employees, who would make comments poking fun at Plaintiff's situation.  Plaintiff's frustration and stress at work also affected his sleep, and he had outbursts with his wife due to his anxiety, depression, and irritation at work.

63.    Carethers also credibly testified, however, that he did not understand that Plaintiff's references to stress in his emails meant stress in a medically diagnosed sense (such as depression), and instead believed that Plaintiff was simply referring to stress that anyone may feel at work.  Indeed, the timbre of many of Plaintiff's emails was so dramatic and/or challenging that Carethers' understanding of these emails is not unreasonable.  Further, although Carethers knew at this time that Plaintiff was seeing a therapist, Plaintiff requested this time as part of his EEO activities[8] and Carethers therefore was not aware that Plaintiff

---

[8]  Plaintiff had retained Dr. Robert Davé to assess the effects of work-related stress on Plaintiff's mental health, and Plaintiff met with him for 58 hours between May 14, 2008 and February 2014.

was seeing a therapist to address symptoms of work-related stress and/or depression.

64.    After Carethers failed to give Plaintiff more work, Plaintiff began contacting individuals up the chain of command at the VA to alert them of his lack of work and the apparent mismanagement of VA resources.  *See, e.g.*, Pl.'s Ex. 285 (May 19, 2010 letter from Plaintiff's attorney to VA Secretary Eric Shinseki); Pl.'s Ex. 338 (May 19, 2010 letter to Hastings).

65.    On May 19, 2010, Hastings responded to Plaintiff's request for more work assignments, asking him to identify "where in our organization you might contribute to our continued expansion."  Doc. No. 131, SF ¶ 12; Pl.'s Ex. 338.  On May 21, 2010, Plaintiff responded, not by answering the question, but instead describing his educational and military experience, and identifying "substantial accomplishments" he helped achieve "as a leader and Manager at VAPIHCS" prior to his assignment to work at the CFA under Carethers.  Doc. No. 131, SF ¶ 14; Pl.'s Ex. 338.  JangDhari, who was copied on these emails, wrote Plaintiff on June 2, 2010 that "Dr. Hastings will be back next week but I have a call in to Dr. Carethers to discuss so that I can get some information on workload/assignments in preparation for the Director's return."  Doc. No. 131, SF ¶ 15; Pl.'s Ex. 338. Plaintiff received no further communications from Hastings or JangDhari

regarding his requests for work.  Doc. No. 131, SF ¶ 16.

66.    Plaintiff also sent letters to the VA Inspector General and U.S. Senator Daniel Akaka reporting abuse in that he was getting paid for doing no work, Pl.'s Exs. 52, 54, and spoke to the Honolulu Star Advertiser, resulting in a June 18, 2010 article titled, "VA official gets big pay, little work."  Pl.'s Ex. 57. Miyamoto was quoted in the article, stating, among other things, that Plaintiff's "interpersonal relations in the workplace affect how he receives and completes assignments and what assignments are given to him.  These are also matters pending in litigation."  *Id.*  Plaintiff testified that although he read the article and Miyamoto's assertions, he did not understand the connection between not getting work assignments and his alleged poor performance.  *See* Doc. No. 176, Trial Tr. at 7-116.  Plaintiff's testimony on this point is not credible, especially in light of Miyamoto's clear statement as to why Plaintiff did not receive meaningful work.

**F.    Discrete Acts Identified by Plaintiff as Retaliatory in 2010**

*1.    Plaintiff's Office Move*

67.    On April 29, 2010, Carethers reassigned Plaintiff to work in the area at the CFA depicted in Plaintiff's Exhibit 16, after being moved out of a private office he previously occupied.  Doc. No. 131, SF ¶ 7.  This work area is a semi-public cubicle next to the waiting area for outpatients receiving rehabilitation

services -- a television is mounted on the wall next to his cubicle for the waiting area, some seats in the waiting area are situated such that individuals may look into Plaintiff's cubicle, and patients will often ask Plaintiff for assistance if the receptionist is not at her desk.  Plaintiff's cubicle also contains a large cabinet for other workers, and Plaintiff must exit his area to allow them access to the cabinet. Another distraction is the "Wanderguard" alarm directly over his cubicle, which alerts throughout the facility when a patient has left a particular area and which also alerts three times a day for testing.  When Plaintiff initially moved into his cubicle, the alarm was malfunctioning and sounded more often than usual (nine times on a typical day), which was fixed after a month or two after Plaintiff's move.  Finally, Plaintiff initially had no phone (although he received one four to six weeks later).

68.     Plaintiff took issue with the manner in which he was told that he needed to move out of his office.  Although Carethers had notified Plaintiff of the impending move two weeks prior and Plaintiff knew he needed to move by the end of that day, Carethers and Spillane told Plaintiff that he needed to move out of his office while he was eating his lunch.  Plaintiff became upset, and Carethers laughed at Plaintiff's reaction.  Plaintiff subsequently emailed Carethers about this incident in a message titled "Your Unprofessional Conduct," complaining about

Carethers' handling of the move.  Pl.'s Ex. 17.

69.     Carethers credibly testified that Plaintiff's move out of his office was necessitated by space constraints in the CFA -- the CFA had hired more employees over time, but had no new facilities in which to place them.  With the assistance of an interior designer, Carethers shuffled employees within the existing space, with offices given to those needing privacy for confidential information (*e.g.*, human resources, supervisors who need to counsel employees, and doctors with patient information).  A doctor was placed into Plaintiff's office, some doctors shared offices, and open work areas were forced to house more employees.  *See* Pl.'s Ex. 20.  Carethers also credibly testified that he did not consider putting Plaintiff in a clinical area where there may have been room (*i.e.*, the B and C wings of the CFA), because that space was reserved for clinical personnel, and he would not put any administrator there due to patient confidentiality concerns.  Doc. No. 182, Trial Tr. 10-55 - 10-57.  And Plaintiff did not identify any space he believes Carethers could have placed him within the CFA.

70.     Spillane testified that she believed Carethers could have placed two doctors who had individual offices (Drs. Gatchell and Lum) into one shared office, or that Gatchell could be placed on the B-wing where he treats patients.  She also testified that she did not know why Dr. Suzuki has two offices, one in the GREC

and one in Mental Health. Doc. No. 150-1, Spillane Depo. at 106-07. The court does not credit this testimony -- Carethers testified that Gatchell was not employed with the GREC until 2012, Doc. No. 181, Trial Tr. at 9-195 - 9-196, and Carethers is in a much better position to determine where doctors' offices should be and whether doctors can share offices. Again, Spillane, in whole, appeared hostile to Carethers, resulting in a lack of credibility.

71.    Plaintiff credibly testified that his new office space increased his stress and depression, as his lack of work was now on public display and he felt that coworkers began to disrespect him more.

72.    Plaintiff complained about his office conditions on several occasions to Carethers. In a May 6, 2010 email to Carethers, Plaintiff expressed concerns about his lack of work, and further wrote:

> To compound my situation, you have assigned me to work in a partially enclosed area which is not private. It is located adjacent to the REHAB waiting area where there is continual conversation by patients, visitors and staff members, and constant television sound. The noise levels are very disturbing and disruptive. While knowing that I have almost no work assignment, you have done nothing, except make my working situation worse. Not having any work is very stressful and, boring for me. My concerns have gone unheeded by you . . . .

Doc. No. 131, SF ¶ 8; Pl.'s Ex. 337.

73.    In a June 5, 2010 email entitled "TORTURE CHAMBER," Plaintiff

46

described that he was working in "a very tiny and noisy workspace, only partially enclosed," in which the alarm directly above the work area emits a "loud beeping and annoying shrill" as often as 8 times daily. Plaintiff further asserted that "[t]he loud beeping and annoying shrill adversely affects my mental status, forces me to walk around, and does not allow me to concentrate. As a physician, when do you plan to demonstrate compassion?" Pl.'s Ex. 218.

74. Carethers responded to Plaintiff's June 5, 2010 email in a June 10, 2010 email, explaining that Plaintiff's assignment to that space was "temporary" and that Plaintiff would "be in another space in less than one year." Doc. No. 131, SF ¶ 19; Pl.'s Ex. 34. Carethers credibly testified that he did not interpret Plaintiff's emails as requesting an accommodation for a disability, and that Plaintiff was simply complaining about stress and his office space in a generic sense.

75. Plaintiff is still in the same office space today. *See* Doc. No. 131, SF ¶ 20. Although Carethers had stated that the cubicle would be temporary, the CFA workforce had continued to grow, increasing the space constraints. The court finds Carethers credible that he believed the move would be for less than a year.

///

///

## 2.    *Denial of Authorized Absence*

76.    As described above, throughout Plaintiff's tenure, Carethers has been aware of Plaintiff's EEO activity, has given Plaintiff unlimited time to work on his EEO cases at work, and has approved over 100 hours of Authorized Absence ("AA") -- leave with pay -- for EEO activities.  Plaintiff was, however, denied AA for an EEO counselor interview at his attorney's office occurring on June 16, 2010.[9]  Specifically, on June 15, 2010, Plaintiff emailed Spillane with the request (copying Carethers), and she responded that she would only approve Administrative Leave ("AL") (leave without pay).  Pl.'s Ex. 328.

77.    Although the email responses were from Spillane, Carethers testified that he denied the AA request.  *See* Doc. No. 170, Trial Tr. at 2-162 - 2-163. Carethers explained that it was his understanding that employees have a reasonable amount of AA for EEO matters, but believed this particular request was unreasonable because Plaintiff could have taken the call via teleconferencing. Indeed, Carethers was previously informed by Miyamoto that pursuant to 29 C.F.R. § 1614.605(b), employees should be given AA only "to prepare the complaint and response to agency and EEOC requests for information," and that

---

[9]  The VA ORM "Partial Acceptance of EEO Complaint" regarding this event recites that it occurred on June 19, 2010.  *See* Pl.'s Ex. 203.  Because Plaintiff's email requests leave for June 16, 2010, *see* Pl.'s Ex. 328, the court refers to event as occurring on June 16, 2010.

time for other matters did not require AA.  *See* Pl.'s Ex. 329.

78.     The court does not credit Carethers' explanation -- Spillane denied the request outright, and neither Carethers nor Spillane ever suggested to Plaintiff that he could take the phone call at the office and/or take AA for the time of the teleconference only (they were both well aware of Plaintiff's semi-public office). And although Plaintiff (repeatedly) asked for an explanation of the denial, neither Spillane nor Carethers provided any response.[10]  It therefore appears that Carethers' reasons for denying AA are an ex post facto excuse.

### 3.     *Request to Change Duty Hours*

79.     On July 20, 2010, Plaintiff requested that Carethers allow Plaintiff to change his tour of duty hours from 7:30 a.m. to 4:00 p.m. by a half-hour to 7:00 a.m. to 3:30 p.m.  After Carethers asked for a justification, Plaintiff explained that he usually arrives at his duty station at 6:30 a.m., he has no work to do, the TV in the waiting area is on from 7:30 a.m. to 4:00 p.m., and the alarm above him "emits annoying beeps."  Plaintiff further asserted that "[s]uch situation . . . is not conducive to reducing stress.  I am sure, as a physician, you would recommend

---

[10]  Plaintiff was also denied (1) AL on September 2, 2010 to receive a Forensic Psychological Consultation for EEO Complaint purposes, Doc. No. 131, SF ¶ 50; and (2) AA on April 5, 2013, for a meeting with his attorneys regarding EEO matters.  *Id.* ¶ 102.  No further details of these events are provided in the record, and as a result, the court draws no inferences from them.

that a person should minimize his time in this work situation I described." Pl.'s Ex. 289. Carethers denied the request, stating that "[t]his change in duty hours does not benefit the organization." *Id.* After receiving this denial, Plaintiff appealed to Director of Human Resources Randell Stansfield, Director Hastings, and Chief of Staff Dr. William Dubbs, arguing that other employees at the CFA had modified tours of duty. Stansfield, Hastings, and Dubbs all found no reason to overrule Carethers' decision.[11] *Id.*

80.     When asked at trial to explain how a change in Plaintiff's tour of duty would not benefit the GREC, Carethers asserted that he needed Plaintiff present for the daily 7:30 a.m. meetings to make sure Plaintiff was present during duty hours and available for assignments. Given that Plaintiff was seeking to start his tour of duty *earlier*, Carethers admitted that his reasoning "doesn't make any sense." Doc. No. 170, Trial Tr. at 2-184. Further, there were some employees who were allowed a modified tour of duty, *id.* at 2-186 - 2-187, although these employees did not attend the daily morning meetings. Carethers did, however, deny Spillane's modified tour of duty request, who like Plaintiff, also attends the morning meetings, has conflicts with Carethers regarding her work, and has also

_____

[11]  Plaintiff renewed his request for a modified tour of duty when he returned from sick leave in September 2012, which was similarly denied. Pl.'s Ex. 380. Plaintiff did not make this request as seeking an accommodation for a disability, and the court therefore does not consider this as part of Plaintiff's Rehabilitation Act claims.

filed EEO complaints against Carethers.

## G.    Plaintiff's Medical Condition

### 1.    *Plaintiff's Leave November 29, 2010 through April 5, 2012*

81.    On November 23, 2010, Jennifer Loh, M.D., who was treating

Plaintiff's type 2 diabetes, prescribed sick leave for Plaintiff for 90 days, stating:

"Mr. Yonemoto is under my care for his diabetes.  He has had a significant amount

of work related stress that has negatively impacted his ability to care for his

diabetes and health.  I am requesting that he take 90 days of sick leave, effective

Monday November 29, 2010."  Doc. No. 131, SF ¶ 40; Pl.'s Ex. 46.

82.    At trial, Loh was offered and accepted with no objection as an expert

in endocrinology and the treatment of diabetes mellitus.  Loh described that if left

uncontrolled, a type 2 diabetic faces significant long-term risks including heart

attack, stroke, nerve problems, blindness, kidney damage, and damage to the

extremities.  Short-term risks include dehydration, dizziness, sleepiness, trouble

seeing, and trouble with excessive thirst and urination.

83.    Plaintiff had been referred to Loh in 2008 for treatment of his

diabetes, and from July through November 2010, Plaintiff had needed to increase

his insulin to control his diabetes.  By the time of her November 23, 2010 letter,

Loh saw that although Plaintiff's A1C levels were at the goal set by the American

Diabetes Association, his blood sugar readings were elevated, and Plaintiff reported that he was experiencing stress at work, which was negatively affecting his diabetes. As a result, Plaintiff requested, and she agreed with, a 90-day medical leave so that Plaintiff could focus on diet and exercise and eliminate the stress of work.

84.     Loh had never requested a 90-day medical leave of absence from work for a patient before, but believed the time off would eliminate Plaintiff's work stress and allow him to devote more time to exercise and diet. *See* Doc. No. 171, Trial Tr. at 3-147. Further, although Plaintiff had requested this leave of absence, Loh testified that she would not have recommended the time off if she did not believe it was appropriate. *Id.* at 3-193.

85.     Plaintiff also received a November 23, 2010 letter from Licensed Clinical Social Worker Hubert Hayakawa, stating that he agreed with Loh's request for sick leave because of Plaintiff's "increasing symptoms of depressed mood, difficulty sleeping, excessive worrying about things, lack of energy and increasing health challenges over his ongoing circumstances at work . . . [and d]espite his compliance to treatment recommendations." Hayakawa stated that this "request for sick leave to address his overall health issues at this time is of the utmost priority." Doc. No. 131, SF ¶ 42; Pl.'s Ex. 46.

86.     At trial, Hayakawa was offered and accepted without objection as an expert in clinical social work diagnosis and treatment of psychological illnesses with regard to his treatment of Plaintiff.  Hayakawa began treating Plaintiff in January 2010 (Plaintiff was referred to him by another therapist), to assist Plaintiff in dealing with Plaintiff's stress at work caused by Plaintiff's reported unfair treatment and workspace move.  Over the course of treatment, Hayakawa diagnosed Plaintiff variably with occupational maladjustment; stress reaction emotional, adjustment disorder; and adjustment disorder with depressed mood.  Regardless of the particular diagnosis, Plaintiff reported depression, anxiety, worry, and decreased energy and motivation due to his working conditions, and these symptoms appeared to increase as his diabetes worsened.  Given Plaintiff's worsening diabetes, Hayakawa concurred with Loh's decision to request a 90-day leave of absence.

87.     Dr. Daniel Lorber was offered and accepted without objection as an expert in endocrinology specializing in causation, diagnosis, and treatment of diabetes mellitus.  Lorber credibly testified regarding the interplay between stress and diabetes -- stress makes it more difficult for individuals to concentrate on self-care behaviors necessary to control diabetes and may increase insulin resistence, resulting in the need for more medication.  Based on his review of Plaintiff's

medical records, Lorber opined that Plaintiff's stress at work was a substantial contributing factor to the deterioration of his diabetes, as shown by its improvement while away from work and worsening when he returned (discussed more below).

88.     Loh similarly opined that Plaintiff's stressors at work negatively impacted Plaintiff's blood sugar levels and ability to manage his diabetes, as Plaintiff had less time to exercise and found himself eating more. Loh further agreed that a significant factor in Plaintiff's ability to manage his diabetes was workplace stress.

89.     Dr. Robert Davé was offered and accepted without objection as an expert in clinical psychology. Davé reviewed Plaintiff's medical records and met with Plaintiff for 58 hours between May 14, 2008 and February 2014 for purposes of litigation. He diagnosed Plaintiff with major depressive disorder in partial remission, which he opines is due to Plaintiff's conditions of employment, in particular, the lack of work, being on public display, and feeling humiliation due to his situation. Although this diagnosis differs from Hayakawa's, Davé explained that the two are not inconsistent and both are clinically significant. Davé further explained that Plaintiff's stress due to his working conditions was not simply run-of-the-mill stress that anyone may feel, but was compounded due to the longevity

of the conditions he was exposed to, including monotony, under-stimulation, meaninglessness of tasks, lack of variety, little to do, work of low social value, and isolated work. These conditions increased Plaintiff's deterioration, resulting in depression. Davé further credibly testified that he ruled out malingering and over-representation of symptoms, and determined that other potential stressors were not the primary cause of depression. In particular, he rejected that Plaintiff's many EEO complaints and litigations were the cause of stress and depression, as the stress appears to wax and wane based on work stressors.[12]

90.     In sum, based on the credible, uncontradicted testimony of Loh, Hayakawa, Lorber, and Davé, the court finds that Plaintiff's lack of work and placement into a semi-public cubicle exacerbated Plaintiff's diabetes and depression.

91.     Prior to receiving Loh's and Hayakawa's November 23, 2010 letters, Carethers was unaware that Plaintiff had diabetes and/or was diagnosed with depression (Carethers was aware only that Plaintiff saw a therapist in connection with the EEO matters, for which he approved AA).

92.     On December 2, 2010, Carethers called Loh. Carethers and Loh

_____

[12] Plaintiff has spent over $2 million in litigating his various EEO and other related charges, which suggests that Plaintiff had other considerable stressors in his life.

provide different versions of their conversation.  According to Loh, Carethers led

her to assume that he was Plaintiff's treating physician because he identified

himself as a geriatrician with the VA and was aware of medical information that

was not in her letter.  In the conversation, Carethers asserted that he disagreed

with the 90-day leave and asked about Plaintiff's stressors, to which Loh

responded that Plaintiff told her that his supervisor was harassing him.  According

to Loh, it was only then that Carethers identified himself as Plaintiff's supervisor,

and told her that she should take detailed notes because she would likely be called

to provide testimony in a legal proceeding.  Doc. No. 171, Trial Tr. at 3-151 - 3-

153.  Given his tone, Loh took these assertions as a threat.  *See* Pl.'s Ex. 47.  In a

December 10, 2010 letter to Carethers, Loh recapped the conversation and

asserted that (1) he misled her "into giving [him] information that would normally

only transpire between physicians discussing the medical treatment of a shared

patient," (2) his telling her that she should keep her notes and that she will be

called to testify "could be construed as threats and intimidation," and (3) any

further communications should be directed to her employer's legal counsel.  Pl.'s

Ex. 47.

93.     In comparison, Carethers asserts that he identified himself as

Plaintiff's supervisor, denies threatening her, and only told her to keep notes to

refresh her recollection in the future if necessary. (Indeed, it was Carethers' practice to take notes on his interactions with Plaintiff given Plaintiff's EEO Complaints). Doc. No. 170, Trial Tr. at 2-191 - 2-193. From the court's observations of both Carethers' and Loh's demeanor and manner of testifying, the court does not believe that Carethers intentionally misled Loh. Rather, it appears by the preponderance of the evidence that the two crossed signals in speaking with each other, leading to this misunderstanding. The court therefore draws no negative inference against Carethers or Loh based on this misunderstanding.

94.     Carethers granted Plaintiff's request for 90 days leave. Doc. No. 131, SF ¶ 41. From November 29, 2010 through April 5, 2012, Plaintiff expended his accumulated sick leave, annual (vacation) leave, and advanced sick leave, and took considerable leave without pay. At no time did Carethers deny any request for medical leave arising from Plaintiff's medical condition. *Id.* ¶ 43.

95.     With the time away from work, both Hayakawa and Loh noted improvements with Plaintiff's stress and diabetes. Plaintiff reported less stress to Hayakawa, and Plaintiff was able to lessen his insulin intake as his weight and blood sugar decreased over time through better diet and exercise.

///

///

## 2.    *Plaintiff's Requests for Accommodation*

96.    On February 24, 2011, Loh provided Plaintiff a letter stating that Plaintiff "has made significant improvements with his health," but that "[i]n order for him to return to work, and continue to adequately care for his diabetes, I am requesting that you provide him with the following specific work related accommodations . . . ." Pl.'s Ex. 48.   The accommodations requested included that:

> 1. During his twice daily coffee breaks, he should be allowed to walk around for 15 minutes in the morning and 15 minutes in the afternoon.  He also should be free to walk at lunch time.
> 2. He should be allowed to check his blood sugars and take his insulin several times daily in a reasonably private, clean, area.
> In addition to the above, Mr. Yonemoto has reported that he experiences a certain amount of stress at work which tends to aggravate his diabetes control. . . .
> [I]t would be preferred if reasonable accommodations can be made to his work environment to reduce unnecessary stress for management of his diabetes condition. These steps include the following:
> a. Providing Mr. Yonemoto with a reasonably quiet area to work;
> b. Giving Mr. Yonemoto assignments/tasks commensurate with his grade level.
> c. Avoiding social isolation and providing reasonable opportunity to socialize with peers and VA patients as his work allows.

Pls.'s Ex. 48.  Loh further provided that "[i]t is my medical opinion that these accommodations will allow Mr. Yonemoto to adequately care for his diabetes while at work." *Id.*

97.     Loh testified that each of these requests was directed to Plaintiff's diabetes -- (1) walking during breaks was the type of exercise that she had prescribed for Plaintiff;[13] (2) checking blood sugars and taking insulin levels in a private, clean area was to assure maintenance and treatment of diabetes; (3) a reasonably quiet work area and assignments commensurate with his grade were due to his reports that he had nothing to do, which was making it difficult to control stress; and (4) avoiding social isolation was to help his mental health and in turn the control of his diabetes.  Doc. No. 171, Trial Tr. at 3-163 - 3-165.

98.     Loh's February 24, 2011 letter was received by VAPIHCS Director Hastings.  Doc. No. 131, SF ¶ 55.  Carethers also recalled receiving this letter, and confirmed that this letter requested accommodations for a disability.

99.     Also in February 2011, Carethers received notice from the State of Hawaii's Regulated Industries Complaints office that Plaintiff had initiated an investigation against him based on Carethers' December 2, 2010 call to Loh.  *See* Doc. No. 181, Trial Tr. 9-86 - 9-87; Def.'s Ex. 593.  This investigation made Carethers more careful in his interactions with Plaintiff.  Doc. No. 181, Trial Tr. 9-87 - 9-88.  The investigation remained open until October 2012, when it was

---

[13] Loh testified that Plaintiff had told her that Carethers made it difficult for Plaintiff to stand up and walk around.  The credible evidence presented does not support such assertion, which is at best a gross exaggeration of the incident in which Carethers asked Plaintiff to limit his walking and socializing time to breaks.

dismissed without disciplinary action against Carethers' license. *Id.*; Def.'s Ex. 595.

100. On March 15, 2011, Plaintiff's attorney received a response from Hastings, providing that Loh's letter "has been sent to Dr. Carethers with guidance from Human Resources where necessary. He will work with Mr. Yonemoto to define his working environment and responsibilities when he returns to the work place." Doc. No. 131, SF ¶ 56; Pl.'s Ex. 314.

101. On March 18, 2011, Plaintiff's attorney wrote to Hastings, stating that Hastings' letter was not a "good faith interactive communication because it offers nothing -- only an offer to talk or 'work with' the employee after 'he returns to the work place' which caused his injury." Doc. No. 131, SF ¶ 57; Pl.'s Ex. 351. As an alternative, Plaintiff's attorney proposed that given Carethers' expressed opinion that Plaintiff is "useless," Plaintiff should come back to work and be allowed to stay at home, on paid administrative leave, when he does not have work to perform. Pl.'s Ex. 351.

102. On April 1, 2011, Plaintiff's attorney wrote to Hastings noting that Hastings had not responded to his March 18, 2011 letter proposing the "accommodation compromise/alternative" that Plaintiff be allowed to stay at home on paid administrative leave when he has no work. Pl.'s Ex. 316.

103. On April 26, 2011, Hastings responded to Plaintiff's attorney's April 1, 2011 letter, referring Plaintiff's attorney to Hastings' March 15, 2011 letter. Pl.'s Ex. 358.

104. On May 20, 2011, Plaintiff's attorney wrote to Carethers, asserting that communicating directly with Carethers is stressful for Plaintiff, and asking for an alternative point of contact to discuss health related and communication matters. Pl.'s Ex. 363.

105. On June 24, 2011, Carethers wrote to Plaintiff, addressing Loh's requests for accommodation as follows:

a. As with other employees, you can walk during your defined breaks and lunch time in the appropriate areas.

b. As with other diabetic employees, you can do finger-stick testing at your desk or in the bathrooms. The CFA is slated to have mounted needle disposal containers installed in some bathrooms.

c. As with other employees your workplace will meet Federal Standards for Noise Levels.

d. As with other employees, you may already socialize at appropriate times and places that do not disrupt the workplace.

e. What you are requesting is already available to you without completion of an interaction process to determine whether you are a qualified individual with a disability covered by the Rehabilitation Act. In other words, Dr. Loh's suggested working conditions exist for all employees including you. Please let me know if you desire to engage further in the interactive process necessary to determine whether or not you are a qualified individual with a disability covered under the Rehabilitation Act. If you do, I will seek further guidance from HR as to what information and steps are required.

Def.'s Ex. 555.[14]

106. On July 19, 2011,[15] Plaintiff's attorney wrote to Carethers stating that Carethers' June 24, 2011 letter "ignores Dr. Loh's reasonable (and crucial) accommodation that Mr. Yonemoto be provided full work commensurate with his grade, as well as the enforced and prolonged social isolation attendant to the agency's failure to implement said accommodation." Pl.'s Ex. 318. The letter further asserted that Carethers ignored Plaintiff's alternative suggestion that Plaintiff be allowed to remain home on paid administrative leave when he has no work. *Id.*

107. The record and the testimony at trial does not reveal any response by Carethers.

108. Carethers' failure to respond, and the entire manner in which he dealt

---

[14] This letter also addressed several requests by Plaintiff's counsel to explain why Plaintiff's badge no longer gave him access to the CFA. Plaintiff's attorney had asserted that Plaintiff had been accessing the facility to check his email and regular mail, read current employee notices, and access his pay and employment records, and that his badge no longer worked and he was told that he was not wanted in the building. Pl.'s Ex. 357. In response, Carethers asked Plaintiff to identify who allegedly told Plaintiff that he was not wanted at the facility and to provide his VA badge number and expiration date. Pl.'s Ex. 362. After Plaintiff's attorney asked to know why the access card was deactivated, why Plaintiff's presence is unauthorized, and why no notice was given, Carethers responded in the June 24, 2011 letter that Plaintiff's access to the facility was never restricted, but that Plaintiff had no need to access the mailroom such that his access while on leave was now restricted. Def.'s Ex. 555. In fact, Carethers had cut off Plaintiff's access to the CFA mail room on April 6, 2011. Pl.'s Ex. 353.

[15] This July 19, 2011 letter was the first correspondence within the 45-day window of Plaintiff's first contact with the EEOC regarding his denial of reasonable accommodation claims.

with Plaintiff's requests for accommodations, did not follow the VA written policy outlining the proper procedure when addressing employee requests for accommodation. The policy provides, among other things, that a supervisor such as Carethers will (1) be knowledgeable about the policy and procedures for processing requests for reasonable accommodations and share such knowledge with individuals requesting accommodation; (2) consult with the Local Reasonable Accommodation Coordinator ("LRAC") and legal counsel in making the decision on accommodation; (3) ensure that the process is properly documented and provided to the LRAC; and (4) search for alternative feasible accommodations if the employee's proposed solution is ruled out. Pl.'s Ex. 107 at 8. The policy further provides that requests for accommodation from employees should be processed within 30 calendar days, but preferably within less time. *Id.* at 12.

109. Carethers did not involve the LRAC, Allyson Ebalaroza, in addressing Plaintiff's requests for accommodation, and testified that he was not sure if he was aware of the VA's policy on accommodations at this time. From the testimony provided by Carethers and Ebalaroza and the evidence presented, it was clear that keeping abreast of current VA policy was not a priority for Carethers, and that Carethers is not compliant with VA HR procedures (even though

Ebalaroza provided him a copy of the policy).[16]  Indeed, as to Plaintiff's requests,

Carethers never involved Ebalaroza in addressing Plaintiff's requests for

accommodation, and the correspondences recounted above establish that Carethers

did not meet the deadlines for responding to a request for accommodation.

According to Ebalaroza, she believes that Carethers holds a grudge, resents, and is

offended by the fact that Plaintiff requested an accommodation and subsequently

filed an EEO charge against Carethers when he refused to grant it.  Doc. No. 169,

Trial Tr. at 1-189.  The court gives Ebalaroza's testimony only limited weight, as

Ebalaroza was admittedly not included in the process regarding Plaintiff, and her

experiences with Carethers are from the limited standpoint of a supervisor who is

not following her policies.

110.    Carethers asserted that he would have discussed the request with

someone within Human Resources, Doc. No. 170, Trial Tr. at 2-202, and Miles

Miyamoto, the Assistant Regional Counsel for the VA, testified that he was

consulted for Carethers' June 24, 2011 letter.[17]  Doc. No. 174, Trial Tr. at 6-151 -

---

[16]  Carethers also failed to follow the VA policy on accommodations as to Spillane in
2012 or 2013.  *See* Doc. No. 169, Trial Tr. at 1-147.  As a result of Carethers' failure to follow
the VA policy, Ebalaroza spoke with Dubbs, who asserted that he would speak with Carethers.
She also spoke with Stansfield seeking a meeting with Carethers, who instead recommended
training for all managers.  No training ever took place.

[17]  Such fact appears to be true, as Carethers' June 24, 2011 letter included language
which he would not have used on his own including, for example, that Plaintiff should "let me
(continued...)

6-152.

111.   On February 9, 2012, Carethers testified before an ORM EEO investigator his belief that he was not obligated to interact with Plaintiff concerning his requests for accommodation until Plaintiff returned to work.  *See* Pl.'s Ex. 304 at 17-18.  Carethers further asserted that Plaintiff was not disabled under the Rehabilitation Act because the federal Office of Worker Compensation Programs ("OWCP"), from whom Plaintiff was seeking benefits for sick leave as a result of lack of work, had not determined that he was disabled.  *Id.* at 10.  Miyamoto testified that Carethers' statement regarding Plaintiff's disability was incorrect, and that he did not give him that advice.  Doc. No. 174, Trial Tr. 6-164.

## H.    Plaintiff's Return to Work

112.   On April 5, 2012, Loh provided Plaintiff a letter stating that he "is cleared medically to return to work.  We request that the previously suggested accommodations be provided."  Pl.'s Ex. 103.  Plaintiff had not told her of Carethers' June 24, 2011 letter responding to her requests for accommodation, despite obtaining a November 10, 2011 letter from Loh reiterating her requests for accommodation and asserting that she received no response from VAPIHCS.  *See*

---

[17](...continued)
know if you desire to engage further in the interactive process necessary to determine whether or not you are a qualified individual with a disability covered under the Rehabilitation Act."  *See* Def.'s Ex. 555.

Pl.'s Ex. 49. Plaintiff testified that it "didn't cross my mind" to share Carethers'

June 24, 2011 letter with her. Doc. No. 176, Trial Tr. at 7-186.

113. Plaintiff testified that he would have returned to work earlier if his

accommodations were addressed and/or if Loh had released him. *See id.* at 7-174.

In comparison, Loh testified that Plaintiff had requested this letter to return to

work, and that she would have cleared Plaintiff for work at any time if he had

asked. *See* Doc. No. 171, Trial Tr. at 3-189.

114. Although Carethers had not responded to Plaintiff's more recent

letters requesting accommodation, Plaintiff felt he needed to return to work as he

was using his private retirement fund to pay bills. Indeed, for his absence,

Plaintiff took a total of 1,474.5 hours of leave without pay. *See* Pl.'s Ex. 375.

115. Although Carethers never discussed with Plaintiff his working

conditions and requests for accommodations, Plaintiff conceded at trial that

several of the requests for accommodation in Loh's February 24, 2011 letter were

met when he returned to work. In particular, he was (1) allowed to walk around

during his breaks and at lunchtime, (2) allowed to check his blood sugars and take

his insulin in a reasonably private, clean area, and (3) given reasonable

opportunity to socialize with peers and VA patients as his work permitted. Doc.

No. 176, Trial Tr. at 7-176 - 7-177. As to his request for a reasonably quiet area to

work, Plaintiff testified at trial that although he purchased headphones, he can still hear the noise and that it bothers him. *See id.* at 7-181. Plaintiff had previously testified in 2010, however, that with his headphones "the loud noise and the television, which is right next to me, doesn't bother me." *Id.* at 7-182. Plaintiff admitted that he provided this testimony, *id.*, and the court credits his 2010 testimony as credible, as opposed to his present trial testimony. Further, Loh testified that wearing headphones to block out the noise is an acceptable accommodation. *See* Doc. No. 171, Trial Tr. at 3-187. Finally, Plaintiff testified at trial that he needed *no* accommodations to perform GS-13 level work. *See* Doc. No. 176, Trial Tr. 7-189.

116.    Carethers credibly testified that he rejected Plaintiff's request that he be allowed to stay at home with pay when he had no work, as it would create a terrible precedent by seemingly rewarding Plaintiff for his poor work, and there would be no way for Carethers to supervise Plaintiff.

117.    Carethers also credibly testified he did not believe that Plaintiff could perform GS-13 level work, as it requires an employee to be relatively independent, take initiative on different projects, be able to handle complex projects, and interact with others to maintain projects. Doc. No. 181, Trial Tr. at 9-88 - 9-89. Although Carethers did not provide this explanation to Plaintiff or his attorney,

Carethers believed that Plaintiff was aware of it given Carethers' previous counseling of Plaintiff and the various statements Carethers provided to the EEO regarding Plaintiff's work. *Id.* at 9-89. Indeed, in November 2011, Carethers provided yet another statement, this time in relation to Plaintiff's application for benefits from the OWCP, stating that Plaintiff lacked the skills and personality traits necessary to perform his job and that all departments and supervisors have refused to provide Plaintiff tasks to perform. Def.'s Ex. 565 at 85, 88. Carethers therefore did not discuss his concerns with Plaintiff when he returned to work, as he did not believe it would change Plaintiff's behavior. Doc. No. 181, Trial Tr. at 9-95 - 9-96.

118. Plaintiff's testimony that he was never told of his behavioral problems ignores the evidence that was presented to him throughout his employment at GREC, and further shows Plaintiff's inability to acknowledge and address criticisms of his own work. Even at trial, Plaintiff testified that he does not understand the reference to poor performance. *See* Doc. No. 180, Trial Tr. at 8-31. This testimony lacks credibility.

119. Upon his return, Plaintiff still had little work to do. Plaintiff continued to perform the MSDS inventory, inspections of controlled substances, and his duties as the combined federal campaign key worker. *See* Pl.'s Ex. 374.

Plaintiff also drafted an executive summary on the Microsoft SharePoint program, which required him to seek assistance of other employees because he had not been trained in the program. Further, sometime in 2013, Carethers tasked Plaintiff with performing a key inventory. In total, however, Plaintiff's work took only 8-10 hours per month. This lack of work worsened Plaintiff's diabetes and he reported more symptoms of stress and depression to his care providers.

120.    During this time period, Carethers continued to receive complaints about Plaintiff and his work product. For example, Dara Placas, a receptionist, provided a written July 2012 complaint stating that Plaintiff harassed her after she was unable to have the VA shuttle deviate from its route to pick Plaintiff up from the CFA. *See* Def.'s Ex. 558. As a result of Plaintiff's conduct, she stated that she did not want Plaintiff "near me or to talk to me unless it is strictly work-related." *Id.* When Carethers counseled Plaintiff about this incident, Plaintiff reacted aggressively and repeatedly requested a meeting with Placas and others that witnessed their interactions, which Carethers denied. *See* Def.'s Ex. 559.

121.    In another incident, Plaintiff was tasked with creating an Excel spreadsheet providing a list of Hawaii veterans who would participate in the 2012 "Golden Age Games," an annual "VA Olympics" for seniors, which was scheduled to take place in St. Louis. To complete this task, Plaintiff emailed

JangDhari to obtain the "program for the data bank on the participants" used the year prior when it was held in Hawaii. JangDhari referred Plaintiff back to Richard Velasquez, who was coordinating the games, and reminded Plaintiff that there were only 25 veterans from Hawaii who would be participating in the St. Louis games (suggesting that he didn't need a program to complete this task). *See* Def.'s Ex. 566. Instead, Plaintiff emailed other VA employees on the mainland seeking the program, which raised confidentiality concerns to the extent such program would have the names and confidential information of all of the VA participants. Def.'s Ex. 567. After these concerns were raised up the chain of command to Carethers, this assignment was taken away from Plaintiff. Although the emails on this subject suggest that Plaintiff's request may have been misunderstood by others -- he was seeking only a program and not the participant list -- this assignment is yet another example of how Plaintiff was given a very simple task (compiling a list of approximately 25 names) and he involved many people unnecessarily.

I.    **Change in Work 2014 to Present**

122.   Starting sometime in late 2014, Carethers began assigning Plaintiff more work. In particular, Plaintiff drafted executive summaries providing recommendations in the case of an emergency shutdown, became the GREC

representative on the emergency committee, and also analyzed the space at the CFA to determine how it may accommodate more workers.  Dr. Carethers testified that this last assignment is GS-13 level work.

123.  Carethers testified that he began assigning Plaintiff more work because (1) Carethers stopped receiving so many complaints from other employees such that he trusted Plaintiff to represent the GREC and "not turn other people off," Doc. No. 182, Trial Tr. at 10-60, (2) Plaintiff asked fewer unnecessary questions, and (3) Plaintiff generally performed satisfactorily on the assignments. Carethers rated Plaintiff overall as "excellent" for the time period from October 1, 2013 to September 30, 2014, Pl.'s Ex. 374, and Plaintiff received a bonus of $843 in 2014 and a "Special Contribution Award" in May 2015.  *See* Pl.'s Ex. 1023. Carethers testified that the work Plaintiff is currently performing is GS-13 level work, although Plaintiff requires more direction and shows less initiative than what Carethers normally expects of a GS-13 level employee.  Doc. No. 181, Trial Tr. at 9-142 - 9-143.

124.  With the increase in work, Plaintiff's health has improved.  Plaintiff has seen his therapist only two or three times since November 2014, his stress level is down, and his blood sugar level has dropped.

125.   Throughout this time, Plaintiff has continued to make Freedom of

Information Act requests for coworkers' emails (he plans to write a book about his experiences at the VA), and has spent a total of over two million dollars on litigation expenses throughout his work history. At trial, Plaintiff testified that even today, Plaintiff does not really understand what people are saying about poor performance, Doc. No. 180, Trial Tr. 8-31, that none of the allegations of his poor performance is accurate, *id.* at 8-32, and that these allegations arose out of Carethers' desire to retaliate against him for his EEO activity. *Id.*

## V.  CONCLUSIONS OF LAW

### A.  Plaintiff's Title VII Retaliation Claims

126.   Plaintiff's Title VII retaliation claims are based on both discrete acts (his office move and denial of AA) and hostile work environment (based on lack of work and being forced to work in a semi-public office). The court first outlines the legal framework for a Title VII retaliation claim, and then applies the framework to each of Plaintiff's specific claims based on the facts established at trial.

### *1.  Legal Framework*

127.   An employer may not discriminate against an employee because the employee has opposed an employment practice made unlawful by Title VII. 42 U.S.C. § 2000e-3(a) ("It shall be an unlawful employment practice for an

employer to discriminate against any of his employees . . . because he has opposed any practice [prohibited by Title VII] . . . or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]."); *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 59 (2006) ("Title VII's anti-retaliation provision forbids employer actions that discriminate against an employee . . . because he has opposed a practice that Title VII forbids or has made a charge, testified, assisted, or participated in a Title VII investigation, proceeding, or hearing." (citations and quotation signals omitted)).

128. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), "establishes the proper order of proof in a Title VII case," *Norris*, 900 F.2d at 1329, and applies to Title VII retaliation claims. *See McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1124 (9th Cir. 2004). This burden-shifting framework applies to bench trials where the court is the finder of fact. *See Norris*, 900 F.2d at 1329.

129. The plaintiff first has the burden of establishing his prima facie case that "(1) the plaintiff engaged in a protected activity, (2) the plaintiff suffered an adverse employment action, and (3) there was a causal link between the plaintiff's protected activity and the adverse employment action." *Poland v. Chertoff*, 494 F.3d 1174, 1179-80 (9th Cir. 2007) (citing *Villiarimo v. Aloha Is. Air, Inc.*, 281

F.3d 1054, 1064 (9th Cir. 2002)); *see also Freitag v. Ayers*, 468 F.3d 528, 541 (9th Cir. 2006).

130.  As to the first element, "protected activity" is not limited to the filing of an EEOC complaint.  Rather, protected activity also includes providing testimony regarding an employer's alleged unlawful practices, as well as engaging in other activity intended to "oppose[]" an employer's discriminatory practices.  42 U.S.C. § 2000e-3(a).

131.  As to the second element, the Ninth Circuit defines the term "adverse employment action" "broadly."  *See Fonseca v. Sysco Food Servs. of Ariz., Inc.*, 374 F.3d 840, 847 (9th Cir. 2004) (citing *Ray v. Henderson*, 217 F.3d 1234, 1241 (9th Cir. 2000)).  "An adverse employment action is 'any adverse treatment that is based on a retaliatory motive and is reasonably likely to deter the charging party or others from engaging in protected activity.'"  *Poland*, 494 F.3d at 1180 (quoting *Ray*, 217 F.3d at 1242-43); *see also Burlington*, 548 U.S. at 68 (stating that an adverse employment action is one in which a reasonable employee would have found might well "have dissuaded a reasonable worker from making or supporting a charge of discrimination") (internal quotation omitted).  "Context matters," and "[a] schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school-age

children." *Burlington*, 548 U.S. at 69. An adverse employment action may include, for example, transfers of job duties, negative performance reviews, actions that affect an employee's compensation, and warning letters. *Fonseca*, 374 F.3d at 847 (citing *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987)).

132. Finally, as to causation, Plaintiff must show that the retaliatory motive was the "but for" reason for the unlawful employment action. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013) ("Title VII retaliation claims must be proved according to traditional principles of but-for causation."). The "but for" causal link does not require that the causative event be the *sole* cause of the adverse action; it simply "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Id.* Causation can be inferred by a temporal proximity between the protected activity and the adverse action, where the action follows "close on the heels" of the complaint. *Ray*, 217 F.3d at 1244; *see also Yartzoff*, 809 F.2d at 1376. The adverse employment action must be "very close" to support a theory of causation based on timing alone. *See Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001) (per curiam) (holding that an adverse employment action taken 20 months after the protected conduct "suggests, by itself, no causality at all"); *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1094 (9th Cir. 2008) ("We have held that

causation can be inferred from timing alone where an adverse employment action follows on the heels of protected activity.") (citation and quotation marks omitted).

133.   If Plaintiff establishes a prima facie case of retaliation, the burden shifts to Defendant to offer a legitimate, non-discriminatory explanation for the challenged action.  *Dawson v. Entek Int'l*, 630 F.3d 928, 936 (9th Cir. 2011). "Once the defendant produces sufficient evidence to satisfy this burden, 'the *McDonnell Douglas* framework -- with its presumptions and burdens -- disappear[s],' *Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 142-43 (2000), and the plaintiff 'retains that ultimate burden of persuading the [trier of fact] that [he] has been the victim of intentional discrimination.'"  *Beck v. United Food & Commercial Workers Union, Local 99*, 506 F.3d 874, 883 (9th Cir. 2007) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 508 (1993) (internal quotations omitted)).

134.   "The trier of fact may infer the ultimate fact of intentional discrimination from the plaintiff's prima facie case and disbelief of the defendant's explanation for the action."  *Id.* at 883 (citing *Reeves*, 530 U.S. at 147). Alternatively, "a trier of fact is not required to infer discrimination even if the employer's proffered explanation is unpersuasive."  *Id.* (citations omitted).

## 2. *Application -- April 29, 2010 Office Move*

135.    Plaintiff has established a prima facie case of Title VII retaliation based on his office move.

136.    First, Plaintiff engaged in protected activity throughout his time at the GREC, as established by the various EEO charges he filed and hundreds of hours he spent on these activities while at work.

137.    Second, Plaintiff's office move qualifies as an adverse employment action. *See Ray*, 217 F.3d at 1241 (citing *Knox v. Indiana*, 93 F.3d 1327, 1334 (7th Cir. 1996), for the proposition that an "employer can be liable for retaliation if it permits 'actions like moving the person from a spacious, brightly lit office to a dingy closet'"); *see also White v. Vancouver Neurologists & Neurophysiologists, P.S.*, 2005 WL 3500895, at *3 (W.D. Wash. Dec. 21, 2005) (determining that manager's loss of office space was an adverse employment action for purposes of summary judgment).  Indeed, Plaintiff, who held a GS-13 level management position, was taken from his private office and reassigned to a semi-public cubicle in the waiting area for patients.  This move "is reasonably likely to deter the charging party or others from engaging in protected activity."  *Poland*, 494 F.3d at 1180 (internal quotation marks and citations omitted).

138.    As to the third element -- the causal link between Plaintiff's protected

activity and the office move -- Plaintiff has presented some evidence that a retaliatory motive was the reason for the office move. In particular, Carethers was well aware of Plaintiff's EEO activities, and Plaintiff's EEO activities certainly occurred close in time to this move (indeed, Plaintiff's EEO activities were significant throughout his time at GREC).

139. The court finds, however, that Defendant had a legitimate, non-discriminatory (and non-pretextual) reason for Plaintiff's move -- that it was necessitated due to space constraints. Specifically, the credible evidence at trial establishes that Plaintiff's move to the cubicle was part of a reshuffling of workspace to accommodate the expanding GREC workforce, and offices were given to those needing privacy for confidential information (*e.g.*, human resources, supervisors who need to counsel employees, and doctors with patient information). Carethers required some employees to share offices, and open work areas were required to accommodate more individuals. The court further credits Carethers' explanation that he did not place Plaintiff in a shared office or in a clinical area where there may have been room due to Plaintiff's personality and to limit unnecessary access to confidential patient information. And finally, at trial, no space was ever identified that Plaintiff could have used instead of his current location, especially where, as described below, Plaintiff's significant personality

problems prevented him from meaningfully contributing to the GREC.

140.   Viewing the totality of the evidence, Plaintiff has not carried his ultimate burden of persuading the court that the move was retaliation for his EEO activity.  In particular, the court recognizes that Carethers had initially asserted that Plaintiff would remain in this cubicle for less than one year, which might suggest that the move was retaliatory *if* the GREC workforce had not continued to expand.  But Carethers continued to have space constraints as GREC hired more employees yet had no new space, and his testimony in this regard was credible.  And despite Plaintiff's complaints that this cubicle was a "TORTURE CHAMBER," space at GREC was so limited that during Plaintiff's sick leave, other employees used Plaintiff's area.

141.   Certainly, Carethers could have told Plaintiff with more diplomacy that Plaintiff needed to move out of his office earlier than previously stated (Carethers pushed the time up several hours and told him while Plaintiff ate his lunch), but Title VII "does not set forth a general civility code for the American workplace."  *Burlington*, 548 U.S. at 68 (quotation and citation marks omitted).  Indeed, "[a]n employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work, and that all employees experience," which include "personality

conflicts . . . that generate antipathy," "snubbing by supervisors and co-workers," and "simple lack of good manners." *Id.* (citations omitted).

142. Finally, the court recognizes that the evidence presented establishes that Carethers may have treated difficult employees such as Plaintiff with less civility that others, and he did not utilize many of the administrative tools available for working with such employees. These facts would support at most an inference that Carethers placed Plaintiff in this cubicle in response to Plaintiff's numerous interpersonal problems that Carethers needed to address time and again. Thus, to the extent that Carethers placed Plaintiff in a cubicle out of animus (a finding the court does not ultimately make), it would suggest that Carethers would have moved Plaintiff to the cubicle regardless of Plaintiff's EEO activity. *See, e.g.*, *Vore v. Ind. Bell Tel. Co.*, 32 F.3d 1161, 1162 (7th Cir. 1994) (stating that personality conflicts that are unrelated to racial hostility do not support a Title VII hostile work environment claim); *Jura v. Cnty. of Maui*, 2012 WL 5187845, at *7 (D. Haw. Oct. 17, 2012), *aff'd*, 582 F. App'x 742 (9th Cir. 2014) ("'[P]ersonal animosity is not the equivalent of sex discrimination,' and a plaintiff 'cannot turn a personal feud into a sex discrimination case.'" (quoting *Succar v. Dade Cnty. Sch. Bd.*, 229 F.3d 1343, 1345 (11th Cir. 2000)); *Miceli v. Bechtel BWXT Idaho, L.L.C.*, 2006 WL 980729, at *4 (D. Idaho Apr. 12, 2006) ("Braun's dislike of Miceli

stemmed from a combination of personality and employment background, neither of which have anything to do with Miceli's age.").

143.   In sum, the court finds that Plaintiff was moved to a semi-public cubicle for legitimate reasons, and Plaintiff has failed to carry his burden of establishing that Plaintiff's office move was because of his EEO activity.  The court therefore finds that Plaintiff has failed to establish by a preponderance of the evidence that Defendant violated Title VII by moving Plaintiff to his cubicle.

### 3.    *Application -- Denial of AA on June 16, 2010*

144.   Plaintiff has established his prima facie case that Carethers retaliated against Plaintiff in denying AA for Plaintiff on June 16, 2010.  As described above, Plaintiff engaged in protected activity, and was in fact seeking AA to engage in protected activity of participating in an EEO counselor interview.  *See* 42 U.S.C. § 2000e-3(a) (describing protected activity also including providing testimony regarding an employer's alleged unlawful practices, as well as engaging in other activity intended to "oppose[ ]" an employer's discriminatory practices). Further, given that the very purpose of the AA was to engage in EEO activity, it appears that Carethers denied the request because of this activity.

145.   Defendant has failed to come forward with a legitimate reason for the denial of AA.  In particular, Carethers testified that he denied this request as

unreasonable because Plaintiff could have taken the call via teleconferencing.  The

court does not credit this explanation -- Spillane denied the request outright, and

neither Carethers nor Spillane ever told Plaintiff that he could take the phone call

at the office, or offer a reasonably private place within the office for Plaintiff to

take this call (they were both well aware of Plaintiff's semi-public office through

his numerous complaints).  Further, although Carethers approved over 100 hours

of AA for EEO matters and gave him unlimited time to work on them while at

work, these facts do not establish that in this particular instance, Carethers denied

the request for reasons other than Plaintiff's EEO activities.

146.   Because Defendant has failed to offer a legitimate reason, the court

finds that Plaintiff has established by a preponderance of the evidence that

Defendant retaliated against him in violation of Title VII by denying AA on June

16, 2010.

### 4.    *Application -- Hostile Work Environment*

147.   A hostile work environment may constitute an adverse employment

action for purposes of a retaliation claim.  *See Ray*, 217 F.3d at 1244-45.

Retaliation in the form of a hostile work environment "is actionable only if it is

'sufficiently severe or pervasive to alter the conditions of the victim's employment

and create an abusive working environment.'"  *Id.* at 1245.  To determine whether

a work environment is sufficiently hostile, the court must "look to the totality of the circumstances, including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Id.* (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). The harassment 'must be both objectively and subjectively offensive." *Id.* (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998)).

148. Plaintiff's hostile work environment claim is based on the allegations that beginning on April 26, 2010, he "was prevented from performing the duties listed in his job description and performance plans and was not assigned meaningful work or duties consistent with that description and performance plan and put on public display before his co-workers, veterans and patients while having no work." *See* Doc. No. 126, Pl.'s Trial Br. at 69.

149. Plaintiff established a prima facie hostile work environment claim as to his cubicle. First, Plaintiff engaged in protected activity. Second, Plaintiff presented evidence that his being forced to work in the cubicle was sufficiently severe because Plaintiff was a GS-13 level managerial employee, yet each day he was forced to sit in public display with very little to do. Finally, given the proximity in time between Plaintiff's protected activity and his office move, along

with Plaintiff's multiple emails complaining about his cubicle, an inference could be drawn that Carethers kept Plaintiff assigned in this cubicle because of Plaintiff's protected activity.

150.    As described above, however, the court finds that Plaintiff's move from his private office to a semi-public cubicle was necessitated by space constraints and not in retaliation for Plaintiff's EEO activities.  For those same reasons, the court finds that Defendant did not place and/or keep Plaintiff in this cubicle in retaliation for Plaintiff's protected activity -- Carethers had legitimate (and non-pretextual) reasons for placing Plaintiff in this cubicle (the growing workforce at the GREC and the need for others to have offices), and the space constraints only got worse over time as the GREC hired more employees yet had no new space.  And although Plaintiff sent multiple emails complaining about his workspace, the evidence presented does not suggest any administrative space Plaintiff could take instead of this cubicle (as opposed to clinical areas that Carethers credibly explained were inappropriate).  Considering all these facts together, the court finds that Plaintiff has failed to establish by a preponderance of the evidence that but for his protected activity, Carethers would have assigned Plaintiff to a different work space.

151.    Turning to Plaintiff's hostile work environment claim based on the

lack of work assignments, Plaintiff has established his prima facie case. As described above, Plaintiff engaged in protected activity. Second, the constant lack of work assignments could discourage a reasonable person from engaging in protected activity. *See Ray*, 217 F.3d at 1240. Finally, Plaintiff has presented some evidence that he could perform GS-13 level work -- he successfully performed this type of work in 2000 through 2004 under Director Burge, and is now performing GS-13 level work. Given Carethers' knowledge of Plaintiff's EEO activities, the evidence supports the inference (albeit tenuous) that Defendant refused to assign Plaintiff work in retaliation for Plaintiff's protected activity.

152. The court finds that Defendant had a legitimate (and non-pretextual) reason for failing to assign Plaintiff substantive work -- that Carethers reasonably determined that Plaintiff could not perform GS-13 level work due to Plaintiff's significant personality problems, and it was more work for Carethers to assign Plaintiff work than it was for others to do it.

153. Specifically, Defendant presented a wealth of evidence supporting that from 2005 through 2013, Plaintiff was unable to perform GS-13 level work due to his personality problems, including that (1) by 2005 when Plaintiff was working under O'Neill, Plaintiff's interpersonal problems and numerous complaints from other employees prevented Plaintiff from performing GS-13 level

work; (2) when Plaintiff began work at the GREC, Carethers assigned Plaintiff GS-13 level work, but after time, Carethers encountered the same problems as O'Neill in that Plaintiff had numerous conflicts with other employees, he did not take criticism maturely, and it was easier for other employees or Carethers himself to perform the work due to Plaintiff's numerous questions; (3) Carethers attempted to find Plaintiff substantive work from other supervisors, but by and large, no other supervisors were willing to work with him; and (4) Carethers tried to correct Plaintiff's behavior through informal counseling, yet Plaintiff's inability to take criticism and defensive nature prevented anything constructive coming out of such discussions. Based on this credible evidence, the court finds that Plaintiff could not perform GS-13 level work during the relevant time period for his claim, *i.e.*, from April 2010 until he began receiving more substantive work in 2014.

154. Further, viewing all of the evidence together, the court finds that Plaintiff has failed to establish by a preponderance of the evidence that Defendant created a retaliatory hostile work environment in violation of Title VII based on his lack of work. The credible evidence presented establishes that Plaintiff's *present* ability to perform GS-13 level work is not because Plaintiff could *always* do the work, but because Plaintiff corrected many of his interpersonal problems -- he is no longer asking as many unnecessary questions, and there have not been any

recent complaints regarding his behavior.  Further, as explained above, Carethers certainly could have utilized other counseling techniques to try to correct Plaintiff's behavior and work performance (*e.g.*, a PIP), but Carethers' lack of managerial finesse does not suggest that he retaliated against Plaintiff for his EEO activity -- it does not establish that Carethers would have given Plaintiff more to do but for Plaintiff's EEO activity.  Indeed, Carethers was aware of Plaintiff's EEO activity shortly after Plaintiff began his work at the GREC, yet Carethers tried to work with Plaintiff for the better part of two years before the weight of all of Plaintiff's interpersonal problems made Carethers conclude that Plaintiff could not do the work.

155.   Considering all these facts together, the court finds that Plaintiff could not perform GS-13 level work, and that Plaintiff has failed to establish by a preponderance of the evidence that but for his protected activity, Carethers would have assigned Plaintiff substantive work.

156.   The court further finds that even if it considers Plaintiff's placement in the semi-public cubicle and lack of work together (as opposed to analyzing them separately, as done above), Plaintiff has still failed to establish by a preponderance of the evidence that Defendant created a retaliatory hostile work environment for all the same reasons outlined above (that Carethers had a

legitimate reason for keeping Plaintiff in his cubicle and that Plaintiff could not perform GS-13 level work).

157.   In sum, Plaintiff has failed to establish by a preponderance of the evidence his Title VII hostile work environment claim.

## B.    Rehabilitation Act -- Retaliatory Hostile Work Environment

158.   Plaintiff's Rehabilitation Act claim for retaliatory hostile work environment is subject to the same basic analysis as Plaintiff's Title VII claim.  In particular, "[b]ecause the ADA was modeled on section 504 of the Rehabilitation Act, 'courts have applied the same analysis to claims brought under both statutes.'"  *Boose v. Tri-County Metro. Transp. Dist. of Oregon*, 587 F.3d 997, 1001 n.5 (9th Cir. 2009) (quoting *Zukle v. Regents of Univ. of Cal.*, 166 F.3d 1041, 1045 n.11 (9th Cir. 1999)); *see also Douglas v. Cal. Dep't of Youth Auth.*, 285 F.3d 1226, 1229 n.3 (9th Cir. 2002) (noting that cases interpreting the ADA and the Rehabilitation Act are "interchangeable").  As a result, the elements and burden of proof for a retaliation claim under the Rehabilitation Act is the same as the ADA -- absent direct evidence of retaliation, the court must apply the *McDonnell Douglas* burden-shifting framework.  *See Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1121 (9th Cir. 2000) (en banc), *vacated on other grounds*, 535 U.S. 391 (2002) (adopting the Title VII retaliation framework for ADA retaliation

claims); *see, e.g.*, *Corales v. Moreno Valley Unified Sch. Dist.*, 2010 WL 2384599, at *4 (C.D. Cal. June 10, 2010) (applying framework to Rehabilitation Act claim).

159.   Similar to Plaintiff's Title VII claim, to establish a prima facie Rehabilitation Act retaliation claim Plaintiff must show "(1) involvement in a protected activity, (2) an adverse employment action, and (3) a causal link between the two."  *Coons v. Sec'y of U.S. Dept. of Treasury*, 383 F.3d 879, 887 (9th Cir. 2004) (quoting *Brown v. City of Tucson*, 336 F.3d 1181, 1187 (9th Cir. 2003)); *see also Pardi v. Kaiser Found. Hosp., Inc*., 389 F.3d 840, 849 (9th Cir. 2004) (discussing retaliation claim under the ADA).

160.   Although the Ninth Circuit has not addressed whether the Supreme Court's "but-for" causation standard for Title VII retaliation claims applies to Rehabilitation Act and/or ADA retaliation claims as well, several district courts have persuasively determined that such formulation applies in the disability context.  *See Smith v. Harrington*, 2015 WL 1407292, at *22 (N.D. Cal. Mar. 27, 2015) (collecting cases applying *Nassar* to ADA, and determining that it applies to the Rehabilitation Act as well).  Specifically, "the ADA's retaliation provision, like Title VII's, similarly prohibits retaliation 'because' an individual has opposed an unlawful discriminatory practice," *id.* at *22, and by extension, this "but-for" analysis also applies to the Rehabilitation Act:

The Rehabilitation Act provides that "no otherwise qualified individual with a disability in the United States . . . shall, *solely* by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination" under any program or activity receiving federal funding or assistance. 29 U.S.C. § 794(a) (emphasis added). Section 504(d) of the Rehabilitation Act, in turn, incorporates the ADA's anti-retaliation provision. 29 U.S.C. § 794(d) ("standards used to determine whether this section has been violated in a complaint alleging employment discrimination under this section shall be the standards applied under . . . the Americans with Disabilities Act of 1990"); *Hodge v. Oakland Unified School Dist.*, 2012 WL 1933678, at *8 (N.D. Cal. May 29, 2012). Because of the word "solely," the Rehabilitation Act also has been interpreted to require "but-for" causation. *See Brooks* [*v. Capistrano Unified Sch. Dist.*], 1 F. Supp. 3d [1029, 1037 (9th Cir. 2014)]; *Siring v. Oregon State Bd. of Higher Educ.*, 977 F. Supp. 2d 1058, 1062 (D. Or. 2013); *cf. Head v. Glacier NW, Inc*., 413 F.3d 1053, 1064-65 & n.63 (9th Cir. 2005).

*Id.* at *23.

161.    The court finds this reasoning persuasive and holds that the analytical framework outlined above for Plaintiff's Title VII retaliatory hostile work environment claim applies to Plaintiff's Rehabilitation Act retaliatory hostile work environment claim as well.  Thus, Plaintiff must establish that (1) he engaged in protected activity; (2) Plaintiff suffered an adverse employment action; and (3) the adverse action would not have occurred in the absence of Plaintiff's protected activity.  *See Nassar*, 133 S. Ct. at 2533.  If Plaintiff establishes his

prima facie case, then it is up to Defendant to provide evidence of a legitimate, non-retaliatory reason for the adverse action. Ultimately, Plaintiff bears the burden of persuasion of establishing his retaliation claim.

162. Plaintiff's Rehabilitation Act retaliatory hostile work environment claim is based on the same facts as his Title VII claim -- lack of meaningful assignments and being forced to work in a semi-public cubicle. *See* Doc. No. 126 Trial Tr. at 70.

163. Plaintiff can establish a prima facie case, to the extent based on his conditions of work after he returned from sick leave in April 2012, but not from November 30, 2010 as Plaintiff claims. In particular, Plaintiff first engaged in protected activity for purposes of the Rehabilitation Action when he requested sick leave for his disabilities of depression and diabetes in November, 2010. *See Nunes v. Wal-Mart Stores, Inc.*, 164 F.3d 1243, 1247 (9th Cir. 1999) ("[A]n extended medical leave, or an extension of an existing leave period, may be a reasonable accommodation if it does not pose an undue hardship on the employer."). Plaintiff's request for sick leave was the first time that Carethers was informed of Plaintiff's diabetes and depression, and Plaintiff had not engaged in protected activity for purposes of the Rehabilitation Act prior to that time.

164. Plaintiff's emails predating his sick leave requesting work

assignments and a change in office space due to stress were not requests seeking accommodation for a disability -- Carethers had no knowledge of Plaintiff's diabetes or depression, and all employees may feel stress at working conditions, which do not raise to the level of a disability. *See Benson v. Cal. Corr. Peace Officers Ass'n*, 2010 WL 682285, at *8 (E.D. Cal. Feb. 24, 2010) (finding that "plaintiff's work-related stress is not a recognized disability under the ADA"); *Matheson v. Virgin Islands Cmty. Bank, Corp*., 297 F. Supp. 2d 819, 827 (D.V.I. 2003) (collecting cases for the proposition that "[f]ederal courts have consistently found that stress, without more, is not a disability under the ADA"). Carethers credibly testified that he did not understand Plaintiff's references to stress as referring to any medically-diagnosed condition, and this construction is objectively reasonable under all of the circumstances. The court therefore finds that Plaintiff did not engage in activity protected by the Rehabilitation Act (*i.e.*, requesting an accommodation for a disability) until he requested sick leave in November 2010.

165. Because Plaintiff did not engage in protected activity until November 2010 when he sought and began a medical leave of absence, the first time Plaintiff was subjected to the hostile work environment conditions after this protected activity was on his return to work in April 2012. With Plaintiff's claim so limited,

Plaintiff has established the elements of his prima facie case -- he engaged in protected activity, he was subjected to the pervasive conditions of no work and his semi-public cubicle, and the proximity in time between his requests for accommodation and these events support an inference (albeit a very weak one, as Plaintiff faced these exact conditions prior to November 2010) that Carethers retaliated against Plaintiff because of the sought accommodations.

166.    Regardless of when Plaintiff's retaliation claim commenced,[18] however, the court finds for all the same reasons described above for Plaintiff's Title VII claims, that Defendant established that Carethers had legitimate (and non-pretextual) reasons for not assigning Plaintiff work (his personality issues that prevented him from effectively performing work), and for assigning him to his semi-public cubicle (lack of space).  And Plaintiff has not carried his ultimate burden of persuasion that but for Plaintiff's protected activity, Carethers would not have taken these actions.

167.    The court therefore finds that Plaintiff has failed to establish by a preponderance of the evidence his Rehabilitation Act retaliatory hostile work environment claim.

---

[18] Even if Plaintiff's claim dated back to November 2010 as he claims, it would fail for the same reasoning below.

## C.    Rehabilitation Act -- Failure to Reasonably Accommodate

168.    The basis of Plaintiff's disability claim is that he "was denied reasonable accommodation for his disability through discrete related acts occurring on or after [July 3, 2011], refusing to engage in an interactive process regarding Mr. Yonemoto's work assignments, office assignment and need for modified work schedule."  Doc. No. 126, Pl.'s Trial Br. at 69-70; *see also* Doc. No. 139, Apr. 22, 2015 Order at 14-25 (limiting claim to discrete acts that occurred within forty-five days prior to Plaintiff's first contact with the EEOC).

169.    Because the Rehabilitation Act "incorporates the 'standards' of Title I of the ADA for proving when discrimination in the workplace is actionable," *Fleming v. Yuma Reg'l Med. Ctr.*, 587 F.3d 938, 939 (9th Cir. 2009); *see also Coons*, 383 F.3d at 884, the court determines the legal framework for Plaintiff's claim based on the statutes and caselaw interpreting both the ADA and the Rehabilitation Act.

170.    To establish a violation of the Rehabilitation Act based on employment discrimination, "a plaintiff must demonstrate that (1) [he] is a person with a disability, (2) who is otherwise qualified for employment, and (3) suffered discrimination because of [his] disability."  *Walton v. U.S. Marshals Serv.*, 492 F.3d 998, 1005 (9th Cir. 2007) (citing *Wong v. Regents of the Univ. of Cal.*, 410

F.3d 1052, 1058 (9th Cir. 2005)). In this case, the discrimination identified is the alleged failure to provide a reasonable accommodation to Plaintiff, and 42 U.S.C. § 12112(b)(5)(A) provides that actionable discrimination includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." *See also Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1089 (9th Cir. 2002). The court proceeds to address these elements.

### 1. *Person with a Disability*

171. A "disability" is defined as (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual, (B) a record of such an impairment, or (C) being regarded as having such an impairment. 42 U.S.C. § 12102(2); *see also Walton*, 492 F.3d at 1005 (applying ADA definition to Rehabilitation Act case).

172. Plaintiff established that he is disabled based on his diabetes and depression. As to Plaintiff's depression, however, the only request for accommodation Plaintiff ever sought was his leave of absence, which was granted. Plaintiff's requests for accommodation that are the basis of this claim -- *i.e.*,

substantive work, his office space, and modified work schedule -- were sought as accommodations for his diabetes, and his depression was never mentioned in seeking these accommodations.[19]  The court therefore proceeds to address the remaining elements of Plaintiff's claim as to his diabetes only.

### 2.  *"Otherwise Qualified" and Denial of Reasonable Accommodation*

173.  The analyses for the remaining two elements of Plaintiff's claim -- that Plaintiff establish that he "is otherwise qualified for employment" and that he suffered discrimination because of his disability -- overlap because they both address the existence of reasonable accommodations.  The court therefore first outlines the legal framework for both these elements together, and then applies them to this case.

### a.  *Legal framework*

174.  "A 'qualified individual' is 'an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires.'"  *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 989 (9th Cir. 2007) (en banc) (quoting 42 U.S.C. § 12111(8) (emphasis omitted)).  *See also* 29 C.F.R. § 1630.2(m).

---

[19]  Even if Plaintiff's requests for accommodation could be construed as seeking accommodation for his depression, it would not change the court's overall analysis.

175.    The plaintiff bears the burden of establishing that he is "qualified," which involves a two-step inquiry. *Bates*, 511 F.3d at 990. The court must (1) "examine[] whether the individual satisfies the 'requisite skills, experience, education and other job-related requirements' of the position" such individual holds or desires, and (2) "consider[] whether the individual 'can perform the essential functions of such position' with or without a reasonable accommodation." *Id. See also Johnson v. Bd. of Trustees of Boundary Cnty. Sch. Dist. No. 101*, 666 F.3d 561, 565 (9th Cir. 2011) (quoting 29 C.F.R. § 1630.2(m)).

176.    Under this two-part test, "[t]he first step is to determine if the individual satisfies the prerequisites for the position, such as possessing the appropriate educational background, employment experience, skills, licenses, etc." *Johnson*, 666 F.3d at 565 (quoting 29 C.F.R. Pt. 1630, App. to § 1630.2(m)). Here, Defendant does not dispute that Plaintiff's prior experiences qualified him for his GS-13 position of Health Specialist.

177.    The second step is to determine whether the plaintiff can perform, with or without reasonable accommodation, the job's "essential functions," which are the "fundamental job duties of the employment position . . . not includ[ing] the marginal functions of the position." *Bates*, 511 F.3d at 989 (quoting 29 C.F.R. § 1630.2(n)(1)).

178.     To determine a position's essential functions, the plaintiff bears the ultimate burden of persuasion, but "'an employer who disputes the plaintiff's claim that he can perform the essential functions must put forth evidence establishing those functions.'" *Id.* at 991 (quoting *EEOC v. Wal-Mart*, 477 F.3d 561, 568 (8th Cir. 2007)).  The fact-finder should "consider, among other things, 'the employer's judgment as to what functions of a job are essential,' 42 U.S.C. § 12111(8); job descriptions prepared before advertising or interviewing applicants, *id.*; '[t]he amount of time spent on the job performing the function,' 29 C.F.R. § 1630.2(n)(3)(iii); '[t]he consequences of not requiring the [applicant or employee] to perform the function,' *id*. § 1630.2(n)(3)(iv); and the work experience of current and former employees." *Id.* (quoting § 1630.2(n)(3)(vi), (vii)).  Although a written description of the job is evidence of the essential functions, "'an employer may not turn every condition of employment which it elects to adopt into a job function, let alone an essential job function, merely by including it in a job description.'" *Cripe v. City of San Jose*, 261 F.3d 877, 887 (9th Cir. 2001) (quoting *Echazabal v. Chevron USA, Inc*., 226 F.3d 1063, 1071 (9th Cir. 2000)).

179.     In general, the plaintiff also bears the burden of establishing that he can perform these essential functions "without or without reasonable

accommodation." *See, e.g.*, *Bates*, 511 F.3d at 994 ("If the plaintiff proves that he can perform the job's essential functions either without a reasonable accommodation or with such an accommodation, then he has met his burden to show he is qualified."); *Dark v. Curry Cnty.*, 451 F.3d 1078, 1088 (9th Cir. 2006) (providing that the plaintiff "has the burden of showing the existence of a reasonable accommodation that would have enabled him to perform the essential functions of an available job").

180.    Where the plaintiff's Rehabilitation Act claim is based on a denial of reasonable accommodation, the inquiry of whether the plaintiff can perform the essential functions with or without reasonable accommodation appears to largely overlap the third element of the plaintiff's claim -- *i.e.*, that the plaintiff establish that he suffered discrimination on the basis of disability through the defendant's denial of reasonable accommodation.  Indeed, although there may be factual scenarios that call for distinct inquiries, whether the plaintiff can perform the essential functions of a position with or without reasonable accommodation and whether the plaintiff was denied reasonable accommodation are both generally directed to the heart of a reasonable accommodation dispute.

181.    Although a plaintiff generally has the burden of establishing the existence of reasonable accommodations, *Barnett* reversed the burden, at least at

the summary judgment stage, where the defendant failed to engage in the interactive process. To determine whether this burden-shifting also applies at trial, the court analyzes *Barnett* and subsequent caselaw in some detail.

182. In placing the burden on the employer at summary judgment, *Barnett* described in detail the purpose of the interactive process, which is a "mandatory obligation" "triggered either by a request for accommodation by a disabled employee or by the employer's recognition of the need for such an accommodation." 228 F.3d at 1112; *see also EEOC v. UPS Supply China Solutions*, 620 F.3d 1103, 1110 (9th Cir. 2010); *Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128, 1137 (9th Cir. 2001).

183. *Barnett* describes that in the interactive process, both parties hold essential information -- the employer has "extensive information concerning possible alternative positions or possible accommodations," while the employee "holds essential information for the assessment of the type of reasonable accommodation which would be most effective." 228 F.3d at 1113. As a result,

> [t]he interactive process requires communication and good-faith exploration of possible accommodations between employers and individual employees. The shared goal is to identify an accommodation that allows the employee to perform the job effectively. Both sides must communicate directly, exchange essential information and neither side can delay or obstruct the process.

*Id.* at 1114-15 (footnote omitted and citations omitted); *see also UPS Supply China Solutions*, 620 F.3d at 1110.

184.   Where the interactive process breaks down, *Barnett* explains that the court "'should attempt to isolate the cause of the breakdown [in the interactive process] and then assign responsibility' so that '[l]iability for failure to provide reasonable accommodations ensues only where the employer bears responsibility for the breakdown.'" 228 F.3d at 1115 (quoting *Beck v. Univ. of Wisc. Bd. of Regents*, 75 F.3d 1130, 1135-37 (7th Cir. 1996)).

185.   The interactive process is the "key mechanism for facilitating the integration of disabled employees into the workplace," and "[w]ithout the possibility of liability for failure to engage in the interactive process, employers would have less incentive to engage in a cooperative dialogue and to explore fully the existence and feasibility of reasonable accommodations." *Id.* at 1116.  As a result, *Barnett* held that on summary judgment, "an employer cannot prevail at the summary judgment stage if there is a genuine dispute as to whether the employer engaged in good faith in the interactive process." *Id.*

186.   *Barnett* did not, however, create a stand-alone claim for failure to engage in the interactive process.  Rather, *Barnett* "hold[s] that employers, who fail to engage in the interactive process in good faith, face liability for the

remedies imposed by the statute *if a reasonable accommodation would have been possible*." *Id.* (emphasis added). And *Kramer v. Tosco Corp.*, 233 F. App'x 595, 596 (9th Cir. 2007),[20] explains that the failure to engage in the interactive process "is not itself evidence of failure to reasonably accommodate. There must first exist a reasonable accommodation that will enable the employee to perform the essential functions of the position." (quoting *Humphrey*, 239 F.3d at 1137-38).

187.    *Kramer* also suggests that a plaintiff retains the burden of establishing the existence of a reasonable accommodation at trial. *Kramer* affirmed the district court's rejection of the plaintiff's proposed jury instruction providing that "[i]f you find that the defendant failed to engage in an interactive process with plaintiff, you may consider that as evidence of a failure to reasonably accommodate plaintiff." 233 F. App'x at 596. *Kramer* explains that "[w]hile the jury may consider whether the range of possible accommodations extends beyond those proposed when the employer fails to engage in the interactive process, failure to engage in that process is not itself evidence of failure to reasonably accommodate." *Id.* (internal citation omitted). And because a failure to engage in the interactive process is not itself evidence of failure to reasonable accommodate,

---

[20]    The court cites *Kramer* not as precedent, but as persuasive authority only. *See* 9th Cir. R. 36-3(b).

it stands to reason that the plaintiff must still come forward with evidence of a reasonable accommodation.

188.   This conclusion -- that if a defendant fails to engage in the interactive process, at trial a plaintiff still must establish the existence of a reasonable accommodation -- is consistent with virtually every single other Circuit, all holding that regardless of a defendant's failure to engage in the interactive process, the plaintiff still has the burden to establish a reasonable accommodation.[21]

---

[21] *See, e.g.*, *Stern v. St. Anthony's Health Ctr.*, --- F.3d ----, 2015 WL 3499838, at *13 (7th Cir. June 4, 2015) ("We have stated that an employer's failure to engage in the interactive process 'is actionable "if it prevents identification of an appropriate accommodation for a qualified individual."  Accordingly, [the employee] must show that a reasonable accommodation could be made that would enable her to carry out the essential functions of her job.'" (quoting *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1062 (7th Cir. 2014)); *McElwee v. Cnty. of Orange*, 700 F.3d 635, 642 (2d Cir. 2012) ("[A]n employee may not recover based on his employer's failure to engage in an interactive process if he cannot show that a reasonable accommodation existed at the time of his dismissal."); *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 581 (4th Cir. 2015) ("An employer will not be liable for failure to engage in the interactive process if the employee ultimately fails to demonstrate the existence of a reasonable accommodation that would allow her to perform the essential functions of the position."); *Minnihan v. Mediacom Commc'ns Corp.*, 779 F.3d 803, 813 (8th Cir. 2015) (describing that where an employer fails to engage in the interactive process, a plaintiff must still establish that "the employee could have been reasonably accommodated but for the employer's lack of good faith"); *E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 766 (6th Cir. 2015) ("Courts thus need not consider this form of non-independent liability [for failure to engage in the interactive process] if the employee fails to present evidence sufficient to reach the jury on the question of whether she was able to perform the essential functions of her job with an accommodation." (citations and quotations omitted)); *Silva v. City of Hidalgo, Tex.*, 575 F. App'x 419, 424 (5th Cir. 2014) ("Accordingly, even if a genuine issue of material fact exists as to whether the City participated in the interactive process in good faith, its dereliction cannot be said to have *led to* a failure to reasonably accommodate Silva because there is no evidence that a reasonable accommodation was feasible."); *Jones v. Nationwide Life Ins. Co.*, 696 F.3d 78, 91

(continued...)

189.     This result makes plain sense -- if *Barnett's* burden-shifting was extended to trial, then a plaintiff would generally be able to establish a denial of reasonable accommodation simply by establishing that he is disabled and that the employer failed to engage in the interactive process.  But such result would be the functional equivalent of a cause of action for failure to engage in the interactive process, which *Barnett* and *Kramer* have rejected.  Further, the plaintiff is in the best position to know his limitations, and by trial the plaintiff has had the benefit of full discovery such that he should be able to identify a specific reasonable accommodation he was denied.  And if Plaintiff has no burden to identify an accommodation, the court would be left to speculate as to damages for denial of a reasonable accommodation that was never determined at trial.

---

[21](...continued)
(1st Cir. 2012) (dismissing claim where employee did not satisfy burden of proffering accommodations that were reasonable under the circumstances, and explaining that "liability for failure to engage in an interactive process depends on a finding that, had a good faith interactive process occurred, the parties could have found a reasonable accommodation that would enable the disabled person to perform the job's essential functions." (internal quotations omitted)); *Hennagir v. Utah Dep't of Corr.*, 587 F.3d 1255, 1265 (10th Cir. 2009) ("Even if [an employer] fail[s] to fulfill its interactive obligations to help secure a [reasonable accommodation], [the plaintiff] will not be entitled to recovery unless [s]he can also show that a reasonable accommodation was possible . . . ."  (quoting *Smith v. Midland Brake, Inc*., 180 F.3d 1154, 1174 (10th Cir. 1999) (en banc)); *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1256 n.2 (11th Cir. 2001) ("[R]egardless of whether the ADA required [an employer] to engage [the employee] in an interactive process, [the employee's] discrimination claims fail unless he can show that an accommodation reasonably could have been made."); *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 319-20 (3d Cir. 1999) (describing that where an employer fails to engage in the interactive process, a plaintiff must still establish that "the employee could have been reasonably accommodated but for the employer's lack of good faith").

190.    The only case that the court could find -- whether in this circuit or any

other circuit -- suggesting that at trial the employer still bears the burden of

establishing the lack of reasonable accommodation is *Morton v. United Parcel*

*Serv., Inc.*, 272 F.3d 1249, 1256 (9th Cir. 2001). *Morton*, a summary judgment

case, not a post-trial appeal like *Kramer*, cites *Barnett* for the proposition that

"[t]he question whether [the failure to engage in the interactive process] should be

excused because there would in any event have been no reasonable

accommodation available is one as to which the employer, not the employee,

should bear the burden of persuasion throughout the litigation." *Id.*  In a footnote,

*Morton* explains:

> *Barnett* can be read as holding that an employer who has
> not engaged in the interactive process is not entitled to
> summary judgment no matter what the evidence on
> summary judgment shows concerning the actual
> availability of a reasonable accommodation.  It is odd,
> however, to delay until trial an issue that is fact
> dependent, if proof of the relevant facts -- here, the facts
> pertinent to proving that a relevant accommodation was
> available -- will be necessary at trial.  We therefore
> understand *Barnett* as holding, instead, that the task of
> proving the negative -- that no reasonable
> accommodation was available -- rests with an offending
> employer throughout the litigation, and that, given the
> difficulty of proving such a negative, it is not likely that
> an employer will be able to establish on summary
> judgment the absence of a disputed fact as to this
> question.

*Id.* at 1256 n.7 (emphasis omitted).

191.    The full passage in *Barnett* to which *Morton* cites merely suggests that a jury may consider an employer's failure to engage in the interactive process in considering whether additional accommodations *not* discussed by the parties were reasonable:

> [A]n employer who acts in bad faith in the interactive process will be liable if the jury can reasonably conclude that the employee would have been able to perform the job with accommodations.  In making that determination, the jury is entitled to bear in mind that had the employer participated in good faith, there may have been other, unmentioned possible accommodations.

228 F.3d at 1115-16 (quoting *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 317-18 (3d Cir. 1999)).  *Barnett* therefore does not suggest that at trial, the burden is on the defendant-employer who fails to engage in the interactive process.

192.    To determine whether *Morton's* assertion that a defendant who fails to engage in the interactive process bears the burden of persuasion "throughout the litigation" (*i.e.*, at summary judgment *and* trial) is a holding of the court or dicta, the court applies the test established in *United States v. Johnson*, 256 F.3d 895 (9th Cir. 2001).  First, *Morton* was not an appeal from a trial, leaving the "throughout the litigation" language clearly unnecessary to its adjudication of a summary judgment order.  Second, the statement was made casually and without

analysis. The language was added without any discussion, let alone analysis, of the possible alternatives at trial. And last, it appears very unlikely that the *Morton* panel intended, without a much fuller analysis, to establish a burden-shifting rule at odds with virtually every other circuit. In short, the court finds it likely that *Morton's* suggestion that at trial the burden of persuasion rests with a defendant that fails to engage in the interactive process is dicta.

193. The court therefore does not believe that *Morton* outlines a rule in this Circuit that *at trial*, a defendant who fails to engage in the interactive process must establish the lack of a reasonable accommodation. Rather, the better rule, which is supported by *Barnett*, *Kramer*, every other circuit, and common sense, is that at trial, even if a defendant fails to engage in the interactive process, the plaintiff still has the burden of establishing by a preponderance of the evidence the existence of a reasonable accommodation. Where the defendant has failed to engage in the interactive process, the fact-finder (in this case, the court) may "bear in mind that had the employer participated in good faith, there may have been other, unmentioned possible accommodations." *Barnett*, 228 F.3d at 1115-16 (quoting *Taylor*, 184 F.3d at 317-18).

194. To give Plaintiff every benefit of the analysis and in light of *Morton*, however, the court also performs its analysis in the alternative. In particular, after

determining the essential functions of Plaintiff's position and after finding that Defendant failed to engage in the interactive process, the court proceeds to determine whether (1) Plaintiff has established that a reasonable accommodation could have been made that would enable him to carry out the essential functions of his job; and (2) Defendant has established the absence of any reasonable accommodation.

        b.      *Application -- request for work commensurate with his GS-13 level and/or a modified work schedule*

195.   The court first determines the essential functions for Plaintiff's position at the GREC, and then determines whether he could perform those functions with or without reasonable accommodation and/or was denied a reasonable accommodation.

        i.     Essential functions of position

196.   Plaintiff held a managerial, GS-13 level position within the GREC. Although Plaintiff bears the ultimate burden of persuasion as to his position's essential functions, he offered no evidence or argument identifying them. Instead, he asserts that he can perform the work of a GS-13 level employee, as shown from his performance appraisals all rating him as "fully successful" or higher. *See* Doc. No. 189, Trial Br. at 165. Needless to say, this argument does little in identifying the essential functions of Plaintiff's position.

197.    Carethers credibly testified that the essential functions of Plaintiff's position required Plaintiff to be independent, interact with others, and deal with complex issues.  These functions were necessary for Plaintiff to carry out the duties described in the position description for Plaintiff's Health Systems Specialist position, which provides that "[t]he incumbent reports directly to the ACOS for [GREC] and assists in developing and implementing new GREC Programs . . . ."  Pl.'s Ex. 136.  The court credits Carethers' testimony, and it is further supported by common sense -- an upper-level management position such as Plaintiff's requires that the employee be able to carry out his duties without significant oversight, work with others, and handle complicated matters.  The consequences of Plaintiff not having these skills would make him wholly ineffective in this position.  *See* 29 C.F.R. § 1630.2(n)(3)(iv) (providing that the fact-finder should consider "[t]he consequences of not requiring the [employee] to perform the function").

198.    That the essential functions of Plaintiff's position required him to effectively interact with others is reflected throughout his position description requiring him to act as a liaison, negotiate with others, and coordinate personnel.  For example, [u]nder "primary purpose," the position description provides, among other things, that Plaintiff "[i]s responsible for working with staff assigned to Non-

Institutional Care (NIC) Program to establish contracting agreements and liaison with contractors/vendors." Pl.'s Ex. 136 at 2. Under "Knowledge Required by the Position," the position description provides that Plaintiff must have the "skill to plan, organize, and direct team, study work, and to negotiate effectively with management . . . ." *Id.* at 3. Under "Supervisory Controls," the position description provides that in carrying out project plans, Plaintiff is responsible for, among other things, "coordinating with staff and line management personnel." *Id.* at 4. The position description also describes that Plaintiff will have contacts with various persons outside the agency, with the purpose to "influence managers or other officials to accept and implement findings and recommendations on organizational improvement or program effectiveness. May encounter resistance due to such issues as organizational conflict, competing objectives, or resource problems." *Id.* at 6. Finally, under "Other Significant Facts," the position description provides that Plaintiff must "[c]onsistently communicate[] and treat[] customers (patients, visitors, volunteers, and all Medical Center staff) in a courteous, tactful, and respective manner. . . . Handles conflict and problems in dealing with the customer constructively and appropriately." *Id.*

199. In finding that the essential functions of Plaintiff's position required him to work independently, interact with others, and address complex issues, the

court is mindful that the manner in which an employee performs a particular duty should be considered "essential" only where the manner and substance are one and the same.  In other words, the inquiry "focus[es] on the <u>purpose</u> of the function and the <u>result</u> to be accomplished[] rather than the manner in which the function presently is performed."  EEOC, A Technical Assistance Manual on the Employment Provisions (Title I) of the ADA (Jan. 1992), at II-16.  For example, in *Bates*, hearing-impaired applicants for the position of package-car driver, alleged ADA violations after the employer disqualified them for failing to pass the Department of Transportation hearing standard.  511 F.3d at 983.  *Bates* explained that the essential function of the position was not the ability to hear, but rather safe driving, and that the plaintiffs would have the ultimate burden of establishing that they are in fact safe drivers.  *Id.* at 992; *See also Nelson v. Thornburgh*, 567 F. Supp. 369, 373 (E.D. Pa. 1983) (separating essential function of serving clients from the ability to read without the use of an aid).

200.   In this case, the abilities to work independently, interact with others, and address complex issues are not directed simply to the *manner* in which an individual carries out the duties of a Health Systems Specialist or other GS-13 level managerial position, but in fact go to the very heart of the position.  As a result, the court finds that the essential functions of Plaintiff's position include that

Plaintiff work independently, interact with others, and address complex issues.

ii.     Ability to perform essential functions

201.    The credible evidence presented at trial establishes that from 2008 through 2013, which encompasses the time that Plaintiff requested accommodations for his diabetes, Plaintiff was unable to perform any of these essential functions.  As described above, Plaintiff was unable to work independently -- for both complex and menial tasks, Plaintiff would often send a "barrage" of emails asking numerous questions which he should have been able to figure out on his own and/or known to direct to the appropriate people.  Plaintiff also was unable to interact with others -- numerous people, both within and outside the VA, complained about Plaintiff's inappropriate and/or aggressive conduct.  Finally, Plaintiff could not address complex issues -- Plaintiff lacked the acumen, whether due to his personality problems, constant questions, or a combination of the two, to complete substantive work.  These problems forced Carethers and others to do the work assigned to Plaintiff, and prevented Carethers from assigning Plaintiff additional work.  And these problems were only made worse by Plaintiff's lack of recognition that he had these problems and inability to take any constructive criticism.

202.    That Plaintiff's evaluations rated him as "fully successful" during this

time period do not suggest that he could perform these essential functions. As described above, a "fully successful" rating was given to only a small minority of employees, and considered a bad review for a veteran employee such as Plaintiff. Carethers further credibly testified that he gave Plaintiff these ratings not because Plaintiff was successful in carrying out his duties, but because giving Plaintiff a lower review would have only created more work for Carethers. Further, these reviews during this time period show that Plaintiff was no longer performing any of the functions of his Health Systems Specialist position (instead, Plaintiff was assigned only a few menial tasks), such that a rating of "fully successful" is meaningless in showing Plaintiff's ability to perform the essential functions of his position.

203.   In sum, the court finds that Plaintiff could not perform the essential functions of his position. The court therefore turns to whether a reasonable accommodation would have allowed Plaintiff to perform them.

iii.   Reasonable accommodation and the interactive process

204.   To address the parties' burdens on the reasonable accommodation issue, the court must first determine whether Defendant met its obligation to engage in the interactive process.

205.   Defendant's obligation to engage in the interactive process with

Plaintiff was triggered by Plaintiff's attorney's multiple letters requesting accommodations for Plaintiff to return to work. Carethers provided only one substantive response to these letters -- his June 24, 2011 letter -- which failed to address Plaintiff's requested accommodations of work commensurate with the GS-13 grade and/or the alternative that Plaintiff be permitted to stay at home on paid leave. As a result, Plaintiff's attorney wrote Carethers a July 19, 2011 letter -- which is within the 45-day window of Plaintiff's first contact with the EEO regarding his accommodation claims -- pointing out that Carethers ignored these requests.

206. Carethers never responded to the July 19, 2011 letter, much less discussed the requests for accommodation with Plaintiff or his attorney at any time after July 19, 2011. Although the requests for accommodation made in the July 19, 2011 letter were not reasonable (explained below), the court finds that Carethers still had an obligation to discuss possible accommodations with Plaintiff. Plaintiff was essentially seeking accommodations so that he could return from his extended medical leave, and in this context, Carethers should have engaged in some type of dialog seeking to facilitate Plaintiff's return.

207. Carethers is therefore responsible for the breakdown in communication. The court therefore proceeds to determine whether a reasonable

accommodation was possible.

iv.   Reasonable accommodation -- Plaintiff's burden

208.   Assuming that Plaintiff still has the burden of identifying a reasonable accommodation that would allow him to perform the essential functions of his position, Plaintiff has failed to carry such burden.  Plaintiff has proffered no accommodation whatsoever to assist him in meeting the essential functions of his position, instead asserting that he needed *no* accommodations to perform GS-13 level work.  *See* Doc. No. 176, Trial Tr. 7-189.  In light of the significant and credible evidence establishing that Plaintiff was given only menial tasks because of his serious personality and interpersonal problems which prevented him from working independently, interacting with others, and completing complex assignments, Plaintiff's assertion that he needed no accommodation is merely additional evidence that Plaintiff never understood how his behavior has (at least until recently) prevented him from carrying out his work.

209.   The court further finds that the accommodations that Plaintiff requested -- work commensurate with this GS-13 level and/or being allowed to stay home when he had no work -- were not reasonable accommodations.

210.   As to the request for GS-13 level work (or work commensurate with GS-13 level work), the credible evidence presented at trial establishes that

Plaintiff was incapable of performing this level of work given his significant interpersonal and personality problems such that assigning him this work was not a reasonable accommodation. Indeed, assigning Plaintiff this work would have only created more work for the other employees that would have to do the work after Plaintiff could not, as well as for Carethers, who would not only have to answer the numerous additional inappropriate questions that more work would generate but also address the additional complaints he would no doubt receive from Plaintiff's inappropriate conduct. Lowering Carethers' expectations for a GS-13 employee is not a reasonable accommodation. *See Kelley v. Amazon.com, Inc.*, 2013 WL 6119229, at *9 (E.D. Wash. Nov. 21, 2013) ("As a general proposition, however, an accommodation that requires an employer to lower a uniform performance standard for a particular employee is not reasonable."). Further, Defendant has established by a preponderance of the credible evidence that having to address the additional complaints from employees and the "barrage" of questions from Plaintiff that additional work would create would have imposed an undue hardship on Defendant.

211.   It was also an unreasonable accommodation for Plaintiff to go home if he had no work (which was the vast majority of his time at the GREC). Carethers credibly testified that he rejected this request as it would create a terrible

precedent by seemingly rewarding Plaintiff for his poor work, and there would be no way for Carethers to supervise Plaintiff. And Plaintiff does not cite, and the court could not find, any cases suggesting that a reasonable accommodation is to give a disabled employee leave *with* pay while not working.

212. Further, to the extent that Defendant's failure to engage in the interactive process opens the door to the court considering whether other accommodations were possible, Plaintiff proffers no other accommodations which he believes are reasonable. In fact, he testified at trial that he could, at any relevant time, perform GS-13 level work without any accommodation. The court therefore finds that Plaintiff has failed to establish by a preponderance of the evidence that he could perform the essential functions of his position with or without reasonable accommodation and/or that he was denied a reasonable accommodation.

> v. Reasonable accommodation -- Defendant's burden

213. To the extent Defendant's failure to engage in the interactive process places the burden on Defendant to establish the lack of a reasonable accommodation, the court finds that Defendant has carried such burden.

214. As explained above, it would be an unreasonable accommodation to assign Plaintiff GS-13 level work (or work commensurate with GS-13 level work)

or to allow Plaintiff to remain at home on paid leave when he had no work to complete. The credible evidence further establishes that alternative accommodations would not have been reasonable.

215. Specifically, it would have been an unreasonable accommodation for Carethers to assign Plaintiff more work that did not rise to the level of GS-13 level work simply to keep Plaintiff busy. Even when Carethers assigned Plaintiff menial tasks -- such as the MSDS inventory and Golden Games list of participants -- Plaintiff still had numerous inappropriate questions and Carethers fielded numerous complaints from other employees regarding Plaintiff's conduct. Assigning Plaintiff more work would have only increased these problems and placed an undue burden on Carethers. That is, Plaintiff's interpersonal and personality problems prevented him from performing even the most basic and menial tasks.

216. It would also be an unreasonable accommodation for Plaintiff to work with other supervisors. Carethers attempted to find Plaintiff work with others, but these supervisors simply did not want to deal with Plaintiff. Further, having Plaintiff work with other supervisors would not have fixed Plaintiff's serious interpersonal problems and only transferred these problems to another supervisor. Under these circumstances, providing Plaintiff more work, whether within the

GREC or elsewhere, was not a reasonable accommodation.

217. Defendant has also proven that Plaintiff was not open to counseling by Carethers or others regarding his interpersonal problems in the hope that Plaintiff would correct his behavior. Carethers had tried to counsel Plaintiff previously, and Plaintiff's significant interpersonal problems prevented anything constructive coming out of such counseling. The court further finds that a PIP and/or more formal career counseling would not have assisted Plaintiff in meeting the essential functions of his position -- Plaintiff had a long-standing hostility to any form of criticism, and even at trial he asserts that he does not understand what performance problems he had.

218. Finally, the court finds that engaging in the interactive process with Plaintiff would not have led to the identification of any other reasonable accommodations. The record establishes that Plaintiff was well aware of Carethers' reasons for not assigning him work, and it was only recently that Plaintiff finally started taking actions on his own to conform his behavior to working norms. Carethers credibly testified that he discussed Plaintiff's performance problems with him on a number of occasions, and in every instance, Plaintiff responded with aggression and deflected the criticisms. Carethers also explained in several administrative proceedings that he did not assign Plaintiff

work due to his interpersonal problems, and two of these statements occurred during Plaintiff's leave of absence. Even at trial, Plaintiff asserted that he did not understand what Carethers was talking about because Carethers was not specific. This testimony is not only incredible, but also shows a complete refusal to acknowledge Carethers' reasons for refusing to assign him more work. A discussion regarding Plaintiff's interpersonal problems, in context of the interactive process, would have not resulted in any constructive outcome.

219.    In finding that Defendant established the lack of any reasonable accommodation, the court recognizes that Plaintiff is now performing GS-13 level work -- Carethers has gradually given Plaintiff more work as the complaints from others and Plaintiff's questions have diminished. There is no evidence in the record, however, suggesting that the interactive process or some other accommodation would have brought about these changes in Plaintiff's behavior, especially where Plaintiff responded so aggressively to any type of criticism. So while the court applauds Plaintiff in finally correcting his behavior, no action by Carethers would have hastened this change during the relevant time frame.

220.    In sum, the court finds that under any burden of proof standard, Plaintiff's requests for work commensurate with his GS-13 grade level and/or permission to stay at home with pay were not reasonable accommodations.

Further, no reasonable accommodation existed. The court therefore finds in favor of Defendant on Plaintiff's reasonable accommodation claim, to the extent based on his lack of substantive work.

> b.    *Application -- office space*

221.    Loh requested that Plaintiff be provided a "reasonably quiet area to work," and Carethers responded that Plaintiff's workplace "will meet Federal Standards for Noise Levels." Def.'s Ex. 555. Loh renewed this request again in November 11, 2011, Pl.'s Ex. 49, and Carethers did not respond.

222.    Assuming Plaintiff is a qualified individual and needed a "reasonably quiet area to work" as an accommodation for his diabetes, Plaintiff was already provided a reasonable accommodation before he even made this request. In particular, Plaintiff testified that he wore headphones at this cubicle such that the ambient noise from the waiting areas and alarm "doesn't bother me." *See* Doc. No. 176, Trial Tr. at 7-182. Further, Loh testified that wearing headphones to block out the noise is an acceptable accommodation. *See* Doc. No. 171, Trial Tr. at 3-187.

223.    That this accommodation was reasonable is further supported by the fact that Plaintiff is currently performing GS-13 level work and is still in the same cubicle. As a result, Plaintiff's workspace did not affect Plaintiff's ability to

perform the essential functions of his position.

224.    Finally, to the extent Plaintiff asserts that he should have been provided his own office or another area in which to work, Plaintiff did not make such request as an accommodation for his diabetes.  Rather, he only sought a "reasonably quiet area to work," which was accomplished with Plaintiff's headphones.  And in any event, an "employer is not obligated to provide an employee the accommodation he requests or prefers, the employer need only provide some reasonable accommodation."  *Zivkovic*, 302 F.3d at 1089 (quoting *E.E.O.C. v. Yellow Freight Sys. Inc.*, 253 F.3d 943, 951 (7th Cir. 2001)).

225.    Because Plaintiff was provided a reasonable accommodation, Plaintiff has failed to establish by a preponderance of the evidence that Defendant violated the Rehabilitation Act in addressing Plaintiff's request for a reasonably quiet place to work.

**D.    Damages on Plaintiff's Title VII Retaliation Claim for Denial of AA**

226.    As described above, the court finds that Plaintiff has prevailed only as to his Title VII retaliation claim based on the June 16, 2010 denial of authorized absence.  Pursuant to the parties' Stipulation Regarding Damages, Doc. No. 197, the court finds that Plaintiff is entitled to equitable relief in the form of back pay pursuant to 42 U.S.C. § 2000e-5(g)(1) in the amount of $117.40, and

compensatory damages pursuant to 42 U.S.C. § 1981a(b)(3) in the amount of $1,750.  Doc. No. 197.

## VI.  <u>CONCLUSION</u>

In sum, the court concludes that Plaintiff has not established his claims against Defendant, except as to his Title VII retaliation claim based on the denial of authorized absence on June 16, 2010.  The court awards damages on this claim in the total amount of $1,867.40.  The Clerk of Court is directed to close this case file.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, July 10, 2015.



/s/ J. Michael Seabright
J. Michael Seabright
United States District Judge

*Yonemoto v. McDonald*, Civ. No. 11-00533 JMS-RLP, Findings of Fact and Conclusions of Law